828 F.2d 529
 CONFEDERATED TRIBES AND BANDS OF the YAKIMA INDIAN NATION,
Plaintiffs-Appellees,
v.
Jim WHITESIDE, et al., Defendants,
and
Philip Brendale, Defendant-Appellant.
CONFEDERATED TRIBES AND BANDS OF the YAKIMA INDIAN NATION,
Plaintiffs-Appellants,
v.
COUNTY OF YAKIMA, et al., Defendants-Appellees.
 Nos. 85-4316, 85-4433 and 85-4383.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1986.
Decided Sept. 21, 1987.
 
 James B. Hovis, Yakima, Washington, for plaintiffs-appellants.
 Charles C. Flower, Jeffrey C. Sullivan, David A. Thompson, and Patrick Andreotti, Yakima, Washington, for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before SKOPIL, FLETCHER and POOLE, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 The Confederated Tribes and Bands of the Yakima Indian Nation (Yakima Nation) brought these two cases in federal court seeking a declaratory judgment and an injunction barring the defendants from making or permitting any land use within the Yakima Indian Reservation that is contrary to the Amended Zoning Regulations of the Yakima Nation. In Whiteside I, 617 F.Supp. 735, the district court found that Yakima Nation's interests in zoning fee land owned by non-members within the closed area of the reservation were infringed by the application of Yakima County's (the County) zoning ordinances and therefore precluded county zoning. By contrast, in Whiteside II, 617 F.Supp. 750, the district court found that Yakima Nation did not have the authority to zone non-Indian fee land in the "open" area, and permitted application of the County's ordinances.
 
 
 2
 Defendant Philip Brendale, record owner of fee land in the closed area at issue in Whiteside I, appeals on the ground that Yakima Nation has no interest in regulating fee land owned by non-members. We affirm the judgment in Whiteside I. Yakima Nation appeals the judgment in Whiteside II and argues that the tribe has the authority to zone non-Indian fee land in the open area, and further that the federal and tribal interests outweigh the County's interest in regulating the land. We agree that Yakima Nation possesses the requisite authority to zone, and remand to the district court to balance the federal, tribal and County's interests.
 
 FACTS
 I. Whiteside I
 
 3
 The Yakima Indian Reservation is composed of 1.3 million acres of land. Of this amount, about 807,000 acres, including 740,000 acres in Yakima County, fall within the reservation's closed area. Only 25,000 acres of the closed area within Yakima County are held in fee. The closed area is restricted to members of Yakima Nation and permittees in order to protect and enhance its natural resources, natural foods, medicines, game wildlife, and environment. Much of the closed area is forested with timber, a mainstay of Yakima Nation's economic operations. The closed area is relatively undeveloped. There are no permanent residents in the part of the closed area located in Yakima County.
 
 
 4
 In 1970, Yakima Nation adopted its first zoning ordinance. The ordinance was made more comprehensive in 1972. The tribal code provides for five categories of districts: agricultural, residential, commercial, industrial and restricted. It also establishes requirements for building permits, authorizes the creation of Planned Development Districts, and provides for special use permits. Under the tribal code, only the following uses are permitted in the closed area:
 
 
 5
 1. Harvesting wild crops;
 
 
 6
 2. Grazing, timber production or open field crops;3. Hunting or fishing by Tribal members;
 
 
 7
 4. Camping in temporary structures;
 
 
 8
 5. Tribal camps for the education and recreation of tribal members;
 
 
 9
 6. Construction and occupancy of buildings and structures constructed by the Yakima Nation or the Bureau of Indian Affairs to be used in the furtherance of tribal resources;
 
 
 10
 7. No building or other permanent structure or any appurtenances thereto other than those allowed in Sections 1-6 above shall be allowed in this district;
 
 
 11
 8. Any structure which is authorized in Sections 1-6 above shall be set back 200 feet from any waterway.
 
 
 12
 Yakima County has regulated land use since 1946, but passed its first comprehensive zoning ordinance in 1965. Within the reservation, the County regulates fee land but not trust land. The County zoned the closed area as "forest watershed," which permits such structures as single family dwellings, commercial campgrounds, overnight lodging facilities with less than sixteen units, restaurants, bars, and general stores. The forest-watershed district is designed to conserve land and water while accommodating pressures for residential, recreational and commercial uses. The County has other land-use regulations applicable to fee land. These include the 1974 subdivision ordinance, which imposes standards for streets, water, sewage, drainage, parks and recreation areas, and school sites, the Yakima County Shoreline Master Program and a federal flood insurance program.
 
 
 13
 The Brendale property consists of 160 acres of fee land within the forested portion of the closed area. The nearest county road is over twenty miles away. In January, 1982, Brendale filed four contiguous short plat applications with the Yakima County Planning Department, which issued a Declaration of Non-Significance and later approved the applications. In April, 1983, he submitted a long plat application to divide one of his new twenty-acre parcels into ten two-acre lots. He intended the lots to be sold as summer cabin or trailer sites. The County Planning Department issued a Declaration of Non-Significance, which Yakima Nation appealed on the grounds that the County did not have authority to regulate the Brendale land and that the development would significantly affect the environment. The Commissioners found that the County had jurisdiction, but that an Environmental Impact Statement (EIS) should be prepared. Yakima Nation brought this suit as the County began work on the EIS.
 
 II. Whiteside II
 
 14
 Approximately half of the land in the open area is held in fee. Most of the open area is rangeland, and land used for agriculture, and residential and commercial developments. Agriculture and related activities are the primary source of income. Non-members are permitted to move freely in this area. The County maintains an extensive road system of nearly five hundred miles throughout the open area. Most of the fee land lies within the three incorporated towns of Toppenish, Wapato and Harrah. The rest is scattered throughout the reservation in a checkerboard pattern, some clustered in particular areas. Roughly eighty percent of the population of the open area, including that of the incorporated towns, are non-members of Yakima Nation. It appears that neither Yakima Nation nor the County regulates land use within the incorporated towns.
 
 
 15
 Under Yakima Nation's Amended Zoning Ordinance, the Wilkinson property is zoned "agricultural." This designation indicates that the "principal use of the land is for agricultural purposes." All buildings are prohibited except agriculture related buildings, agriculture product processing plants, buildings on public parks and playgrounds and single family dwellings. The minimum lot size is five acres. This is the only type of agricultural district under the Yakima Nation's Code.
 
 
 16
 The County's agricultural zones include three types: "exclusive agricultural," "general agricultural," and "general rural." Under "exclusive agricultural" lot size minimums are forty acres, under "general agricultural," twenty acres, and under "general rural," one acre. The County has designated the Wilkinson property as "general rural." This zoning is intended to " 'provide protection for the county's unique resources and land base;' 'minimize scattered rural developments ... by encouraging clustered development;' and 'permit only those uses which are compatible with [the] rural character.' " District court opinion in Whiteside II, at 753. The number and variety of uses possible under special use permits is considerably greater than those allowed within exclusive and general agricultural districts. As noted above, the County has other extensive land-use regulations.
 
 
 17
 The Wilkinson property is a forty-acre tract of fee land about three-quarters of a mile south of the reservation's northern boundary. The City of Yakima is three miles to the north of the tract. The property is vacant sagebrush land.
 
 
 18
 In September, 1983, Wilkinson applied to the Yakima County Planning Department to subdivide thirty-two acres into twenty lots ranging in size from 1.1 to 4.5 acres, each lot to be used for a single family residence. Wilkinson submitted an environmental checklist from which the Planning Department initially determined that an EIS was required. However, the Planning Department issued a Declaration of Non-Significance after Wilkinson agreed to modify his proposal. Yakima Nation appealed, arguing that the County was without authority to regulate and that the proposal would significantly affect the environment. The Commissioners affirmed and Yakima Nation filed suit in federal court.
 
 DISCUSSION
 I. Public Law 280
 
 19
 Brendale and the County maintain that Washington's enactment of Wash.Rev.Code Sec. 37.12.010, adopted pursuant to Pub.L. No. 280, 67 Stat. 588 (1953), as amended, 18 U.S.C. Sec. 1162, 28 U.S.C. Sec. 1360 (1982 and Supp. III 1985) (Public Law 280), divested Yakima Nation of authority to regulate the activities of non-Indians on fee-owned land within reservation boundaries. This argument lacks merit. Public Law 280 grants state courts jurisdiction over civil litigation involving reservation Indians, but does not intrude upon tribal regulatory authority. California v. Cabazon Band of Mission Indians, --- U.S. ----, 107 S.Ct. 1083, 1087-88, 94 L.Ed.2d 244 (1987). Because zoning is clearly regulatory, Public Law 280 does not affect Yakima Nation's authority to zone.
 
 II. Preemption and Infringement
 
 20
 Yakima Nation's claim, in essence, is that the state, acting through the County, is barred from imposing its zoning ordinances to control non-member fee land on the reservation. States may impose laws on non-members engaged in activities on Indian reservations unless a given law is preempted by federal law or unless it " 'unlawfully infringes on the right of reservation Indians to self-government.' " United States v. Anderson, 736 F.2d 1358, 1363 (9th Cir.1984) (quoting Colville Confederated Tribes v. Walton, 647 F.2d 42, 51 (9th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981)). We must balance the interests of federal, tribal and state authorities to determine whether a state is precluded from regulating particular conduct of non-members on Indian reservations. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); see also Segundo v. City of Rancho Mirage, 813 F.2d 1387, 1391 (9th Cir.1987).
 
 1. Federal Preemption
 
 21
 Yakima Nation asserts that federal law preempts the application of state law. It lists a number of federal statutes that Yakima Nation maintains embody federal policy to provide for tribal self-government and the protection of reservation resources. Broad preemptive effect is accorded not only specific federal statutes, but the policies animating them. Ramah Navajo School Bd. v. Bureau of Revenue, 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982). We therefore construe preemption generously, and may find preemption even if Congress has not expressly stated an intention to preempt state law. Id.
 
 
 22
 Yakima Nation is correct that many of these statutes, see, e.g., Indian Financing Act of 1974, 25 U.S.C. Sec. 1451 et seq. (1982); Indian Child Welfare Act of 1978, 25 U.S.C. Sec. 1901 et seq. (1982); Indian Civil Rights Act of 1968, 25 U.S.C. Sec. 1301 et seq. (1982), embody and advance a broad federal policy of recognizing Indian sovereignty and encouraging tribal self-government. See New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334-35 & n. 17, 103 S.Ct. 2378, 2386-87 & n. 17, 76 L.Ed.2d 611 (1983). Others facilitate and encourage tribal management of Indian resources. Of particular note, the Indian Self-Determination and Education Assistance Act, 25 U.S.C. Sec. 450 et seq. (1982 and Supp. III 1985), authorizes the Secretary of the Interior, upon a tribe's request, to enter into a contract with the tribe, to reallocate management of land use programs involving trust land, including zoning, from the federal government to the tribe. 25 C.F.R. Sec. 271.32 (1986). These statutes may not establish the "comprehensive and detailed federal involvement in or regulation of the particular tribal activity," Chemehuevi Indian Tribe v. California State Bd. of Equalization, 800 F.2d 1446, 1448 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2184, 95 L.Ed.2d 840 (1987), necessary to find federal preemption, that existed in Bracker, 448 U.S. at 145-48, 100 S.Ct. at 2584-86, or in Segundo, 813 F.2d at 1392-94. At a minimum, however, they embody a federal policy that informs our inquiry concerning the reach of Indian sovereignty.
 
 2. Tribal Authority
 
 23
 Before we may consider Yakima Nation's interest in regulating non-member fee land, we must determine whether it possesses the requisite regulatory authority. The Supreme Court has long recognized the inherent "attributes of sovereignty [in Indian tribes] over both their members and their territory." Iowa Mut. Ins. Co. v. LaPlante, --- U.S. ----, 107 S.Ct. 971, 975, 94 L.Ed.2d 10 (1987) (quoting United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975)). Yakima Nation derives authority not only implicitly from its status as a dependent sovereign, but explicitly from the Treaty with the Yakimas, 12 Stat. 951, 2 Kapplers 524 (1855), in which Yakima Nation and the United States agreed that Yakima Nation reserved to itself and was guaranteed a right to its "own government" and its "own laws."
 
 
 24
 Tribal authority extends to regulation over the activities of non-Indians on reservation lands. Iowa Mutual, 107 S.Ct. at 978. Such authority, however, is more limited than that over Indians. The Supreme Court has, without apparent consistency, applied two tests to determine the limit on tribal authority over the conduct of non-Indians. In Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Court held that tribal sovereignty is divested only when its exercise is inconsistent with overriding federal interests. "[I]t must be remembered that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." Id. at 154, 100 S.Ct. at 2081. Nine months later, the Supreme Court in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), reiterated language disregarded by Colville, that Indian tribes have been implicitly divested of their sovereignty to regulate relations between the tribe and nonmembers by virtue of their dependent status. Id. at 563-64 101 S.Ct. at 1257-58 (citing United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). The Court held that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." Id. 450 U.S. at 564, 101 S.Ct. at 1258.
 
 
 25
 The Montana Court identified two exceptions to the limitation on tribal regulatory authority over non-members. The exceptions stem from inherent tribal authority over the tribe's members and to manage its territory as well as the power to exclude non-members from its reservation. Anderson, 736 F.2d at 1364; Babbitt Ford, Inc. v. Navajo Indian Tribe, 710 F.2d 587, 592 (9th Cir.1983), cert. denied, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984). A tribe retains authority to regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Montana, 450 U.S. at 565, 100 S.Ct. at 1258. A tribe also retains inherent regulatory authority over the conduct of non-Indians on fee land when the conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566, 100 S.Ct. at 1258 (the "tribal interest" test).
 
 
 26
 Yakima Nation asserts that we should apply the Colville test and hold that it has authority to zone non-Indian fee land under that test. Because we conclude that Yakima Nation has authority under the more stringent tribal-interest test employed in Montana, we need not determine whether the Colville analysis is appropriate to determine tribal authority over non-Indians.[1]
 
 
 27
 We recently held that "[i]t is beyond question that land use regulation is within the Tribe's legitimate sovereign authority over its lands." Segundo, 813 F.2d at 1393 (holding that a city could not apply its rent control ordinance in conflict with tribal ordinance to non-Indians on reservation trust land). Zoning, in particular, traditionally has been considered an appropriate exercise of the police power of a local government, precisely because it is designed to promote the health and welfare of its citizens. See Knight v. Shoshone and Arapahoe Indian Tribes of the Wind River Reservation, 670 F.2d 900, 903 (10th Cir.1982); see generally Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). By enacting zoning ordinances, a tribe attempts to protect against the damage caused by uncontrolled development, which can affect all of the residents and land of the reservation.[2] Tribal zoning is particularly important because of the unique relationship of Indians to their lands. Comment, Jurisdiction to Zone Indian Reservations, 53 Wash.L.Rev. 677, 680 (1978).
 
 
 28
 Further, a major goal of zoning is the "systematic and coordinated utilization of land" in a particular area. N. Williams, American Land Planning Law, Sec. 1.06 (1974), cited in Comment, 53 Wash.L.Rev. at 679. Comprehensive planning enables a centralized regulatory authority to balance the competing needs of landowners and to distribute land uses in a desirable pattern. Id. at Sec. 1.08, cited in Comment, 53 Wash.L.Rev. at 685. Yakima Nation has exclusive authority to zone tribal trust land, which constitutes nearly all of the closed area and over half of the open area. Although the fee land owned by non-Indians is clustered primarily in one part of the reservation, the reservation still exhibits essentially a checkerboard pattern. If we were to deny Yakima Nation the right to regulate fee land owned by non-Indians, we would destroy their capacity to engage in comprehensive planning, so fundamental to a zoning scheme. This we are unwilling to do.
 
 3. Balance of Interests
 
 29
 Having concluded that Yakima Nation has the authority to zone non-Indian fee land within the reservation boundaries, we must consider whether the interests of Yakima Nation, as shaped by federal policy, outweigh those of the County. We review the district court's findings of fact, including its balancing of the interests, under a clearly erroneous standard.
 
 A. Whiteside I
 
 30
 In addition to its general interest in asserting political authority--an interest that, as noted above, federal policy seeks to advance--Yakima Nation has a significant interest in zoning the closed area of the reservation. To protect grazing, forest and wildlife resources, Yakima Nation restricted the closed area to its members and permittees in 1954 and the Bureau of Indian Affairs restricted use of federally maintained roads in the closed area in 1972. The closed area is relatively undeveloped, with no permanent residences in the Yakima County portion of the area, and residences in other portions predate the zoning ordinance. The closed area, which is about two-thirds forested, provides substantial economic support to the tribe through timber operations, and supplies many Yakima Nation members with a food supply. Its religious and spiritual value also motivates the Yakima Nation's protection of the closed area from development.
 
 
 31
 The district court found that the Brendale development would cause disruption of Yakima Nation's interests. Construction and use of roads and cabins would cause soil disturbance and erosion, deterioration of ambient air quality, change of water absorption rates and drainage patterns, destruction of some trees and natural vegetation, likely alteration of migration patterns of deer and elk, increased noise levels and thicker population density. Development would necessitate new police and fire services.
 
 
 32
 The County's zoning classification, if applied, would permit the construction of such structures as single family dwellings, commercial campgrounds, overnight lodging facilities with less than six units, restaurants, and bars in the restricted area. The imminence of such construction is suggested by the fact that Brendale, himself, has stated he intends to build other developments on land adjacent to the property which is the subject of this suit. The district court's recognition of Yakima Nation's concern with maintaining the character of the closed area indicates that the court properly focused on Yakima Nation's interest in regulating the entire closed area, including the Brendale property.[3]
 
 
 33
 By contrast, Brendale has not identified any interest the County has in regulating the closed area. The district court noted that the only interest asserted by the County was a general interest in providing regulatory functions to its taxpaying citizens. Further, Brendale has not argued that the Yakima Nation's regulation of the closed area has an effect outside the boundaries of the reservation.[4]
 
 
 34
 We conclude that the district court properly found that the County is precluded from zoning fee land within the closed area because the County's interest in imposing its regulation is outweighed by the significant interests of Yakima Nation.
 
 B. Whiteside II
 
 35
 Yakima Nation has alleged a number of justifications for regulating the open area and in particular the Wilkinson property.[5] The County, by contrast, has not suggested any off-reservation interest in imposing its zoning code on fee land within the reservation. See Mescalero Apache, 462 U.S. at 336, 103 S.Ct. at 2387 ("The exercise of state authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity. Thus a State seeking to impose a tax on a transaction between a tribe and nonmembers must point to more than its general interest in raising revenues. A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention.") (citations omitted).
 
 
 36
 We conclude, however, that for this court to weigh the varying interests at this time would be premature. Because the district court found that Yakima Nation lacked the authority to zone fee land owned by non-Indians within the open area, it did not make findings of fact concerning the interests asserted, nor did it balance the federal, tribal, and state interests. We therefore remand to the district court the issue of whether the interests of Yakima Nation, as shaped by federal policy, outweigh the interests of the County in imposing zoning ordinances on fee land owned by non-Indians in the open area.
 
 CONCLUSION
 
 37
 The district court's judgment in Whiteside I is affirmed. Its judgment in Whiteside II is reversed and remanded.
 
 
 
 [1]
 Most of our cases have applied the Montana test, without referring to the conflicting language in Colville, to determine whether a tribe has the power to regulate non-Indians within reservation boundaries. See, e.g., United States v. Anderson, 736 F.2d 1358 (9th Cir.1984); Babbitt Ford, Inc. v. Navajo Indian Tribe, 710 F.2d 587 (9th Cir.1983), cert. denied, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); Cardin v. De La Cruz, 671 F.2d 363 (9th Cir.), cert. denied, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). We did, however, apply both tests in Confederated Salish and Kootenai Tribes v. Namen, 665 F.2d 951 (9th Cir.), cert. denied, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982)
 
 
 [2]
 The Yakima Nation's Code sets out its purpose:
 The controls as set forth in this ordinance are deemed necessary in order to encourage the most appropriate use of the land; to protect the social and economic stability of residential, agricultural, commercial, industrial, forest, reserved and other areas within the reservation, and to assure the orderly development of such large areas; and to obviate the menace to the public safety resulting from the improper location of buildings and the uses thereof, and the establishment of land uses along primary highways in such a manner as to cause interference with existing and proposed traffic movement on said highways; and to otherwise promote the public health, safety, morale and general welfare in accordance with the rights reserved by the Yakima Indian Nation.
 
 
 [3]
 Brendale points out that Yakima Nation constructed a permanent structure of twelve dormitory cabins and two larger buildings in the closed area. Even if Brendale's development would have no greater impact on the closed area than the Yakima Nation's structure, a question the district court never considered, we believe the proper analysis addresses the multiplied burden of potential additional development that could occur if the Yakima Nation zoning ordinance were revoked
 
 
 [4]
 Perhaps noteworthy, the County, itself, did not join Brendale in appealing the district court's decision
 
 
 [5]
 As alleged, Yakima Nation's interest in controlling land use in the open area, although obviously less compelling than that in the closed area, appears also to be strong. The open area is largely used for agriculture, upon which many tribal members depend for their livelihood. Specifically with regard to the Wilkinson property, Yakima Nation has asserted that the proposal would require the construction of new roads and could alter the flow and quantity of ground water. Yakima Nation alleges that there is a substantial danger of severe erosion and runoff from the subdivision and that the contemplated change in the land use of the Wilkinson parcel and development of the surrounding area, would interfere with Yakima Nation's interest in the integrity of its culture and way of life. Sacred burial grounds are located in the area. Finally, Yakima Nation alleges that increased development would require additional police services