# BRENDALE v. CONFEDERATED TRIBES AND BANDS OF THE YAKIMA INDIAN NATION ET AL.

No. 87–1622.   Argued January 10, 1989—Decided June 29, 1989*

---

*Together with No. 87–1697, *Wilkinson* v. *Confederated Tribes and Bands of the Yakima Indian Nation*, and No. 87–1711, *County of Yakima et al.* v. *Confederated Tribes and Bands of the Yakima Indian Nation*, also on certiorari to the same court.

410

412

WHITE, J., joined by REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., delivered an opinion announcing the judgment of the Court in Nos. 87–1697 and 87–1711 and dissenting in No. 87–1622. STEVENS, J., joined by O'CONNOR, J., delivered an opinion announcing the judgment of the Court in No. 87–1622 and concurring in the judgment in Nos. 87–1697 and 87–1711, *post*, p. 433. BLACKMUN, J., joined by BRENNAN and MARSHALL, JJ., filed an opinion concurring in the judgment in No. 87–1622 and dissenting in Nos. 87–1697 and 87–1711, *post*, p. 448.

*Jeffrey C. Sullivan* argued the cause for petitioners in all cases. With him on the briefs for petitioners in No. 87–1711 was *Terry Austin*. *Charles C. Flower* and *Patrick Andreotti* filed briefs for petitioner in No. 87–1622. *Dale B. Ramerman, Ronald T. Schaps*, and *Michael Mirande* filed briefs for petitioner in No. 87–1697.

*Tim Weaver* argued the cause for respondents in all cases. With him on the brief was *R. Wayne Bjur*.†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Kenneth O. Eikenberry*, Attorney General of Washington, and *Timothy R. Malone*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Robert K. Corbin* of Arizona, *Jim Jones* of Idaho, *Frank J. Kelley* of Michigan, *Michael T. Greely* of Montana, *Brian McKay* of Nevada, *Hal Stratton* of New Mexico, *Nicholas J. Spaeth* of North Dakota, *David L. Wilkinson* of Utah, and *Joseph B. Meyer* of Wyoming; for the State of South Dakota by *Roger A. Tellinghuisen*, Attorney General, and *John P. Guhin*, Deputy Attorney General; for Mendocino County et al. by *Tom D. Tobin;* for the city of Green Bay, Wisconsin, et al. by *James L. Quarles III, William F. Lee*, and *Kathryn Bucher;* for the town of Parker, Arizona, by *John B. Weldon, Jr., Stephen E. Crofton* and *Gerald W. Hunt;* for the Citizens Equal Rights Alliance, Inc., et al. by *Kenn A. Pugh;* for the National Association of Counties et

JUSTICE WHITE, joined by THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY, delivered an opinion announcing the judgment of the Court in Nos. 87–1697 and 87–1711 and dissenting in No. 87–1622.

The issue presented by these three consolidated cases is whether the Yakima Indian Nation or the County of Yakima, a governmental unit of the State of Washington, has the authority to zone fee lands owned by nonmembers of the Tribe located within the boundaries of the Yakima Reservation.

## I

## A

The Confederated Bands and Tribes of the Yakima Indian Nation are composed of 14 originally distinct Indian Tribes that banded together in the mid-1800's to negotiate with the United States. The result of those negotiations was a treaty signed in 1855 and ratified by the Senate in 1859. Treaty between the United States and the Yakima Nation of Indians (Treaty with the Yakimas), 12 Stat. 951. By the terms of the treaty, the Yakima Nation ceded vast areas of land to the

---

al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Robert L. Deitz,* and *F. Henry Habicht II;* and for the Quinault Property Owners Association et al. by *Thomas M. Christ* and *Dennis D. Reynolds.*

Briefs of *amici curiae* urging affirmance were filed for the Colorado River Indian Tribes by *Alletta d'A. Belin* and *William G. Lavell;* for the Confederated Tribes of the Colville Reservation et al. by *Bruce E. Didesch, Allen H. Sanders,* and *Amy L. Crewdson;* for the National Congress of American Indians et al. by *Thomas E. Luebben* and *James A. Bowen;* for the Navajo Nation by *Steven J. Bloxham;* for the Governing Council of the Pinoleville Indian Community by *David J. Rapport;* for the Three Affiliated Tribes of the Fort Berthold Reservation by *Charles A. Hobbs;* for the Standing Rock Sioux Tribe et al. by *William R. Perry* and *Harry R. Sachse;* and for the Swinomish Tribal Community et al. by *Jeanette Wolfley, Thomas R. Acevedo, Jack F. Trope, Jeanne S. Whiteing, Dale T. White, Scott B. McElroy, W. Richard West, Jr.,* and *Daniel A. Raas.*

United States but retained an area, the Yakima Indian Reservation, for its "exclusive use and benefit." *Id.*, at 952.[1]

The reservation is located in the southeastern part of the State of Washington. Approximately 1.3 million acres of land are located within its boundaries. Of that land, roughly 80% is held in trust by the United States for the benefit of the Yakima Nation or individual members of the Tribe. The remaining 20% of the land is owned in fee by Indian or non-Indian owners. Most of the fee land is found in Toppenish, Wapato, and Harrah, the three incorporated towns located in the northeastern part of the reservation. The remaining fee land is scattered throughout the reservation in a "checkerboard" pattern.

The parties to this litigation, as well as the District Court and the Court of Appeals, have treated the Yakima Reservation as divided into two parts: a "closed area" and an "open area." The closed area consists of the western two-thirds of the reservation and is predominantly forest land. Of the approximately 807,000 acres of land in the closed area, 740,000 acres are located in Yakima County. Twenty-five thousand acres of the seven hundred and forty thousand acres are fee land. The closed area is so named because it has been closed to the general public at least since 1972 when the Bureau of Indian Affairs restricted the use of federally maintained roads in the area to members of the Yakima Nation and to its permittees, who must be record landowners or associated with the Tribe.[2] Access to the open area, as its name sug-

---

[1] The treaty further provides that no "white man, excepting those in the employment of the Indian Department, [shall] be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent." 12 Stat. 951, 952.

[2] At oral argument, counsel arguing for petitioners represented that a decision by the Bureau of Indian Affairs in April 1988, after the Court of Appeals issued its opinion here, has reopened the roads in the closed area to the public. Tr. of Oral Arg. 17. See App. to Brief for Petitioner Brendale 1a. According to counsel, there is no longer a closed area on the reservation. Tr. of Oral Arg. 17. Counsel for respondents agreed with

gests, is not likewise restricted to the general public. The open area is primarily rangeland, agricultural land, and land used for residential and commercial development. Almost half of the land in the open area is fee land.

## B

The Yakima Nation adopted its first zoning ordinance in 1970. The ordinance was amended to its present form in 1972. By its terms, the Yakima Nation ordinance applies to all lands within the reservation boundaries, including fee lands owned by Indians or non-Indians. Yakima County adopted its present comprehensive zoning ordinance in 1972, although the county had regulated land use as early as 1946. The county ordinance applies to all real property within county boundaries, except for Indian trust lands. The ordinance establishes a number of use districts, which generally govern agricultural, residential, commercial, industrial, and forest watershed uses. The particular zoning designations at issue are "forest watershed" and "general rural."

The fee lands located in the closed area are zoned by the county ordinance as forest watershed. That designation permits development of single-family dwellings, commercial campgrounds, small overnight lodging facilities, restaurants, bars, general stores and souvenir shops, service stations, marinas, and sawmills. The minimum lot size is one-half acre. None of these uses would be permitted by the zoning des-

---

this characterization, describing what had formerly been the closed area as the "reservation reserved area," based on the Yakima Nation's zoning designation for the area. *Id.*, at 28. Despite these developments, JUSTICE STEVENS persists in treating the two areas differently, *post*, at 439–440, a position that is rejected by seven Members of the Court, see also, *post*, at 468, n. 10 (opinion of BLACKMUN, J.), and continues to rely on the District Court's findings of fact regarding the Brendale property, which are undermined by the change in circumstances. This opinion will continue to refer to the respective areas as the closed area and the open area, but for convenience only.

ignation "reservation restricted area," which applies to the closed area under the Yakima Nation zoning ordinance.

The general rural zoning designation, applicable to land in the open area, is one of three use districts governing agricultural properties. The minimum lot size for land zoned general rural is smaller than that specified for agricultural land in the Yakima Nation ordinance, although the other county use districts for agricultural properties have larger minimum lot sizes than the Yakima Nation ordinance.

## C

### 1

Petitioner Philip Brendale, who is part Indian but not a member of the Yakima Nation, owns a 160-acre tract of land near the center of the forested portion of the closed area. The parcel was originally allotted to Brendale's great aunt, a member of the Yakima Nation. The land passed by inheritance to Brendale's mother and grandfather, who were issued a fee patent in 1963, and then, on his mother's death in 1972, to Brendale. The land is zoned as reservation restricted area by the Yakima Nation. It is zoned forest watershed by Yakima County.

In January 1982, Brendale filed four contiguous "short plat" applications with the Yakima County Planning Department. After determining that the short platting did not require an Environmental Impact Statement (EIS), the department issued a Declaration of Non-Significance. The department requested comments from the Yakima Nation, and after the Tribe did not respond, the short plats were approved.

Brendale then submitted in April 1983 a "long plat" application to divide one of his platted 20-acre parcels into 10 2-acre lots to be sold as summer cabin sites. Each lot is to have an individual well and a septic tank. Electric generators would provide electricity. The proposed plat is bordered on the north and east by other lands owned by Brendale, on the

south by lands owned in fee by the St. Regis Paper Company, and on the west by lands held in trust by the United States. The proposed development would not have been permissible under the Yakima Nation ordinance.

The county planning department again issued a Declaration of Non-Significance. The Yakima Nation appealed the Declaration of Non-Significance to the Yakima County Board of Commissioners on the grounds that the county had no zoning authority over the land and that an EIS was necessary. The commissioners concluded that the appeal was properly before the Board but reversed the planning department and ordered that an EIS be prepared.[3]

2

Petitioner Stanley Wilkinson, a non-Indian and a nonmember of the Yakima Nation, owns a 40-acre tract of land in the open area of the reservation. The tract is located less than a mile from the northern boundary of the reservation and is on a slope overlooking the Yakima Municipal Airport and the city of Yakima. The land is bordered on the north by trust land and on the other three sides by fee land, and is currently vacant sagebrush property. It is zoned agricultural by the Yakima Nation and general rural by Yakima County.

In September 1983, Wilkinson applied to the Yakima County Planning Department to subdivide 32 acres of his land into 20 lots. The lots range in size from 1.1 acres to 4.5 acres. Each is to be used for a single-family home and will be served by individual wells and septic systems. The proposed development would not have been permissible under the Yakima Nation ordinance.

The planning department initially indicated that an EIS needed to be prepared for the project, but later, after Wilkinson modified his proposal, the department issued a Declaration of Non-Significance. The Yakima Nation thereafter ap-

---

[3] Preparation of the EIS was underway when the Yakima Nation filed the present action in District Court.

pealed the Declaration of Non-Significance, again challenging the county's authority to zone the land and alleging that an EIS was necessary. The county board of commissioners concluded that the appeal was properly before it and affirmed the planning department's conclusion that an EIS was not necessary.

D

The Yakima Nation then filed separate actions in United States District Court challenging the proposed development of the Brendale and Wilkinson properties and the county's exercise of zoning authority over the land.[4] The complaints sought a declaratory judgment that the Yakima Nation had exclusive authority to zone the properties at issue and an injunction barring any action or the approval of any action on the land inconsistent with the land-use regulations of the Yakima Nation.

The District Court held that the Yakima Nation had exclusive zoning authority over the Brendale property, *Yakima Indian Nation* v. *Whiteside*, 617 F. Supp. 735, 744, 747 (ED Wash. 1985) *(Whiteside I)*, but concluded that the Tribe lacked authority over the Wilkinson property, *Yakima Indian Nation* v. *Whiteside*, 617 F. Supp. 750, 758 (ED Wash. 1985) *(Whiteside II)*. The District Court looked to this Court's opinion in *Montana* v. *United States*, 450 U. S. 544 (1981), as controlling whether an Indian tribe has authority to regulate activities of nonmembers of the tribe on fee lands. The District Court determined that there was no evidence of any "consensual relationship" between the Yakima Nation

---

[4] In addition to Brendale, Wilkinson, and Yakima County, the Yakima Nation named as defendants Jim Whiteside and two other County Commissioners of Yakima County, the Director of the Planning Department of Yakima County, the codeveloper of the Brendale property, and prospective purchasers of portions of the Wilkinson property. The developer and the prospective purchasers were dismissed as parties by order of the District Court. See *Yakima Indian Nation* v. *Whiteside*, 617 F. Supp. 735, 737, n. 1 (ED Wash. 1985) *(Whiteside I)*; *Yakima Indian Nation* v. *Whiteside*, 617 F. Supp. 750, 751, n. 1 (ED Wash. 1985) *(Whiteside II)*.

and Wilkinson and Brendale that would extend the authority of the Tribe to the fee lands. 617 F. Supp., at 743; 617 F. Supp., at 757. But after making detailed findings of fact,[5] the court concluded that "Brendale's proposed development does indeed pose a threat to the political integrity, the economic security and the health and welfare of the Yakima Nation," and therefore the Tribe has authority to impose its zoning regulations on that property. 617 F. Supp., at 744. The District Court then proceeded to determine that Yakima County was pre-empted from exercising concurrent zoning authority over the land in the closed area because its interests in regulating the land were minimal while the Tribe's interests were substantial. *Id.*, at 747. But because Wilkinson's proposed development did not impose a similar threat, the Tribe had no authority whatsoever over that property. 617 F. Supp., at 758.

On appeal, the Ninth Circuit consolidated the cases and affirmed as to the Brendale property but reversed as to the Wilkinson property. *Confederated Tribes and Bands of the Yakima Indian Nation* v. *Whiteside*, 828 F. 2d 529 (1987). In upholding the Yakima Nation's zoning authority, the Court of Appeals did not disturb or rely on the findings of the District Court. Instead, it concluded that zoning ordinances

---

[5] The District Court found that Brendale's proposed development would disrupt soil conditions; cause a deterioration of air quality; change drainage patterns; destroy some trees and natural vegetation; cause a deterioration of wildlife habitat; alter the location and density of human population in the area; increase traffic, light, and the use of fuel wood; and require added police and fire protection as well as new systems for waste disposal. The court also found that a number of places of religious and cultural significance were located in the closed area and that much of the Tribe's income comes from lumber harvested from lands within the closed area. 617 F. Supp., at 741–742. Unlike the closed area, however, the District Court found that the open area had no unique religious or spiritual importance to the Yakima Nation and that the trust land in the vicinity of the proposed Wilkinson development did not provide a significant source of food for the Tribe. 617 F. Supp., at 755.

by their very nature attempt "to protect against the damage caused by uncontrolled development, which can affect all of the residents and land of the reservation." *Id.*, at 534. According to the Court of Appeals, zoning ordinances are within the police power of local governments precisely because they promote the health and welfare of the community. Moreover, a "major goal" of zoning is coordinated land-use planning. Because fee land is located throughout the reservation in a checkerboard pattern, denying the Yakima Nation the right to zone fee land "would destroy [its] capacity to engage in comprehensive planning, so fundamental to a zoning scheme." This the court was "unwilling" to do. *Id.*, at 534–535.[6]

Brendale, Wilkinson, and Yakima County each petitioned for writ of certiorari.[7] We granted the petitions and consolidated the cases for argument. 487 U. S. 1204 (1988).

## II

The present actions were brought by the Yakima Nation to require development occurring on property within the boundaries of its reservation to proceed in accordance with the Yakima Nation zoning ordinance. The Tribe is necessarily contending that it has the exclusive authority to zone all of the property within the reservation, including the projects at issue here. We therefore examine whether the Yakima Nation has the authority, derived either from its treaty with the

---

[6] The Court of Appeals then remanded to the District Court for findings of fact on the respective interests of the Yakima Nation and Yakima County in regulating the Wilkinson property, since the District Court had made such findings only concerning the Brendale property. *Confederated Tribes and Bands of the Yakima Indian Nation* v. *Whiteside*, 828 F. 2d 529, 536 (CA9 1987).

[7] Yakima County did not appeal the judgment of the District Court in *Whiteside I*, respecting the Brendale Property, App. 7, 11, and the only issue presented in its petition for certiorari concerned the Wilkinson property. Brendale and Wilkinson each petitioned for certiorari concerning their own property.

United States or from its status as an independent sovereign, to zone the fee lands owned by Brendale and Wilkinson.

A

The Yakima Nation argues first that its treaty with the United States establishes its authority to regulate fee land within the reservation but owned by nonmembers of the Tribe. By its terms, the Treaty with the Yakimas provides that the land retained by the Yakima Nation "shall be set apart . . . for the exclusive use and benefit" of the Tribe, and no "white man, excepting those in the employment of the Indian Department, [shall] be permitted to reside upon the said reservation without permission of the tribe." 12 Stat. 951, 952. The Yakima Nation contends that this power to exclude provides the source for its authority over the land at issue here.

We disagree. The Yakima Nation no longer retains the "exclusive use and benefit" of all the land within the reservation boundaries established by the Treaty with the Yakimas. Under the Indian General Allotment Act, 24 Stat. 388, significant portions of the Yakima Reservation, including the tracts of land at issue here, were allotted to individual members of the Tribe. The land was held in trust for a period of years, generally 25 although the period was subject to extension, after which fee patents were issued. *Id.*, at 389, § 5. Over time, through sale and inheritance, nonmembers of the Tribe, such as petitioners Brendale and Wilkinson, have come to own a substantial portion of the allotted land.

We analyzed the effect of the Allotment Act on an Indian tribe's treaty rights to regulate activities of nonmembers on fee land in *Montana* v. *United States.* The treaty language there was virtually identical to the language in the Treaty with the Yakimas, 450 U. S., at 558, and we concluded that "treaty rights with respect to reservation lands must be read in light of the subsequent alienation of those lands." *Id.*, at 561. See also *Puyallup Tribe, Inc.* v. *Washington Game*

*Dept.*, 433 U. S. 165, 174 (1977). In *Montana,* as in the present cases, the lands at issue had been alienated under the Allotment Act, and the Court concluded that "[i]t defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government." 450 U. S., at 560, n. 9.

The Yakima Nation argues that we should not consider the Allotment Act because it was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984. But the Court in *Montana* was well aware of the change in Indian policy engendered by the Indian Reorganization Act and concluded that this fact was irrelevant. 450 U. S., at 560, n. 9. Although the Indian Reorganization Act may have ended the allotment of further lands, it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from thereafter passing to non-Indians.

JUSTICE STEVENS acknowledges that the Allotment Act eliminated tribal authority to exclude nonmembers from fee lands they owned. *Post,* at 436–437. Yet he concludes that Brendale and Wilkinson are somehow subject to a tribal power to "determine the character of the tribal community," *post,* at 437, unless the Tribe has voluntarily surrendered that power. This view of tribal zoning authority as a sort of equitable servitude, *post,* at 442, is wholly unsupported by precedent.

JUSTICE STEVENS begins with a tribe's power to exclude nonmembers from its land and from that power derives a tribal "power to define the character of" that land, *post,* at 434, which he asserts as the basis for the Yakima Nation's exercise of zoning authority over the closed area of its reservation. According to JUSTICE STEVENS, the power to exclude "necessarily must include the lesser power to regulate land

use in the interest of protecting the tribal community."
*Post*, at 433. But the Yakima Nation no longer has the power
to exclude fee owners from its land within the boundaries
of the reservation, as JUSTICE STEVENS concedes. *Post*,
at 437. Therefore, that power can no longer serve as the
basis for tribal exercise of the lesser included power, a result
which is surely not "inconceivable," *post*, at 437, but rather
which is perfectly straightforward. It is irrelevant that the
Tribe had declared the closed area off limits before Brendale
obtained title to his property. Once Brendale obtained title
to his land that land was no longer off limits to him; the tribal
authority to exclude was necessarily overcome by, as JUS-
TICE STEVENS puts it, an "implici[t] grant" of access to the
land. *Ibid.*

Aside from the alleged inconceivability of the result, JUS-
TICE STEVENS offers no support for his assertion that in en-
acting the Allotment Act Congress intended tribes to retain
the "power to determine the character of the tribal commu-
nity." *Ibid.* JUSTICE STEVENS cites only *Seymour* v. *Su-
perintendent of Washington State Penitentiary*, 368 U. S.
351 (1962), and *Mattz* v. *Arnett*, 412 U. S. 481 (1973), in sup-
port of his position. *Post*, at 441–442. Those cases are irrel-
evant to the issue at hand, however, concluding merely that
allotment is consistent with continued reservation status.
Meanwhile, *Montana* is directly to the contrary: the Court
there flatly rejected the existence of a power, derived from
the power to exclude, to regulate activities on lands from
which tribes can no longer exclude nonmembers. See 450
U. S., at 559. JUSTICE STEVENS' attempts to distinguish
*Montana* are unavailing. The distinctions on which he relies,
that the regulation there was discriminatory, posed no threat
to the welfare of the Tribe, and infringed on state interests,
*post*, at 443–444, are not even mentioned in the section of the
*Montana* opinion considering the power to exclude, see 450

U. S., at 557–563, and certainly were not considered by the Court in that case as having any relevance to this issue.[8]

We would follow *Montana* and conclude that, for the reasons stated there, any regulatory power the Tribe might have under the treaty "cannot apply to lands held in fee by non-Indians." *Id.*, at 559.

## B

An Indian tribe's treaty power to exclude nonmembers of the tribe from its lands is not the only source of Indian regulatory authority. In *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 141 (1982), the Court held that tribes have inherent sovereignty independent of that authority arising from their power to exclude. Prior to the European settlement of the New World, Indian tribes were "self-governing sovereign political communities," *United States* v. *Wheeler*, 435 U. S. 313, 322–323 (1978), and they still retain some "elements of 'quasi-sovereign' authority after ceding their lands to the United States and announcing their dependence on the Federal Government," *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, 208 (1978). Thus, an Indian tribe generally retains sovereignty by way of tribal self-government and control over other aspects of its internal affairs. *Montana, supra*, at 564.

A tribe's inherent sovereignty, however, is divested to the extent it is inconsistent with the tribe's dependent status,

---

[8] Furthermore, the practical consequences of JUSTICE STEVENS' approach will be severe. JUSTICE STEVENS' conception of tribal zoning authority allows Indian tribes to obtain the power to zone by defining areas on their reservations that contain only a "small percentage" of fee lands. *Post*, at 437–438, n. 2. The uncertainty that would result from the necessarily case-by-case determination of which regulatory body (or bodies, see *post*, at 440–441, n. 3) has zoning jurisdiction over such land, not to mention the uncertainty as to when a tribe will attempt to assert such jurisdiction, would be far worse than that resulting from the scheme discussed *infra*, at 430–432, in which the contours of the zoning authority are clearly defined and resort to the courts to protect tribal interests should not often be required.

that is, to the extent it involves a tribe's "external relations." *Wheeler*, 435 U. S., at 326.[9] Those cases in which the Court has found a tribe's sovereignty divested generally are those "involving the relations between an Indian tribe and nonmembers of the tribe." *Ibid.* For example, Indian tribes cannot freely alienate their lands to non-Indians, *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 667–668 (1974), cannot enter directly into commercial or governmental relations with foreign nations, *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832), and cannot exercise criminal jurisdiction over non-Indians in tribal courts, *Oliphant, supra*, at 195.

This list is by no means exclusive, as *Montana* makes clear. In *Montana*, the Crow Tribe sought to prohibit hunting and fishing within its reservation by anyone not a member of the Tribe. The Court held that the Tribe's inherent sovereignty did not support extending the prohibition on hunting and fishing to fee lands owned by non-Indians. It recognized the general principle that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." 450 U. S., at 564. Because regulation of hunting and fishing on fee lands owned by nonmembers of the Tribe did not bear any "clear relationship to tribal self-government or internal relations," *ibid.*, this general principle precluded extension of tribal jurisdiction to the fee lands at issue.

The Yakima Nation contends that the Court's insistence in *Montana* on an express congressional delegation of tribal power over nonmembers is inconsistent with language in *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 153 (1980), that tribal powers are

---

[9] Given our disposition of these cases, we need not address whether the Yakima Nation's retained sovereignty might also have been divested by treaty or statute. *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978). See, *e. g.*, *Rice* v. *Rehner*, 463 U. S. 713, 724 (1983).

divested by implication only when "the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government." We do not see this language as inconsistent with *Montana*. As the opinion in *Colville* made clear, that case involved "[t]he power to tax transactions occurring on trust lands and significantly involving a tribe or its members." 447 U. S., at 152. It did not involve the regulation of fee lands, as did *Montana*. Moreover, the Court in *Montana* itself reconciled the two cases, citing *Colville* as an example of the sort of "consensual relationship" that might even support tribal authority over nonmembers on fee lands. 450 U. S., at 565–566.[10]

JUSTICE BLACKMUN takes a slightly different approach, relying particularly on *Colville* and *Wheeler* for the proposition that "tribal sovereignty is not implicitly divested except in those limited circumstances principally involving external powers of sovereignty where the exercise of tribal authority is *necessarily* inconsistent with their dependent status." *Post*, at 451–452. But JUSTICE BLACKMUN ignores what the Court made clear in *Wheeler*, in a passage immediately preceding the one he cites: that regulation of "the relations between an Indian tribe and nonmembers of the tribe" is necessarily inconsistent with a tribe's dependent status, and therefore tribal sovereignty over such matters of "external relations" is divested. 435 U. S., at 326. Indeed, it is precisely this discussion that the Court relied upon in *Montana* as "distinguish[ing] between those inherent powers retained by the tribes and those divested." 450 U. S., at 564.

---

[10] The Yakima Nation's reliance on statements about retained tribal sovereignty in *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845 (1985), and *Iowa Mutual Ins. Co.* v. *LaPlante*, 480 U. S. 9 (1987), is likewise misplaced. In neither of those cases did the Court decide whether the Indian Tribe had authority over the nonmembers involved. Instead, the Court established an exhaustion rule, allowing the tribal courts initially to determine whether they have jurisdiction, and left open the possibility that the exercise of jurisdiction could be later challenged in federal court. See 471 U. S., at 856–857; 480 U. S., at 16, 19.

There is no contention here that Congress has expressly delegated to the Yakima Nation the power to zone fee lands of nonmembers of the Tribe. Cf. 18 U. S. C. §§ 1151, 1161 (1982 ed., and Supp. V); 33 U. S. C. §§ 1377(e) and (h)(1) (1982 ed., Supp. V). Therefore under the general principle enunciated in *Montana*, the Yakima Nation has no authority to impose its zoning ordinance on the fee lands owned by petitioners Brendale and Wilkinson.

## C

Our inquiry does not end here because the opinion in *Montana* noted two "exceptions" to its general principle. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U. S., at 565. Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 566.

The parties agree that the first *Montana* exception does not apply in these cases. Brendale and Wilkinson do not have a "consensual relationship" with the Yakima Nation simply by virtue of their status as landowners within reservation boundaries, as *Montana* itself necessarily decided. The Yakima Nation instead contends that the Tribe has authority to zone under the second *Montana* exception. We disagree.

Initially, we reject as overbroad the Ninth Circuit's categorical acceptance of tribal zoning authority over lands within reservation boundaries. We find it significant that the so-called second *Montana* exception is prefaced by the word "may"—"[a] tribe *may* also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands

within its reservation." *Ibid.* (emphasis added). This indicates to us that a tribe's authority need not extend to all conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," but instead depends on the circumstances. The Ninth Circuit, however, transformed this indication that there may be other cases in which a tribe has an interest in activities of nonmembers on fee land into a rule describing every case in which a tribe has such an interest. Indeed, the Ninth Circuit equated an Indian tribe's retained sovereignty with a local government's police power, which is contrary to *Montana* itself. *Montana* rejected tribal sovereignty to regulate hunting and fishing on fee land owned by non-Indians, which clearly is a power within the police power of local governments.[11]

It is also evident that a literal application of the second exception would make little sense in the circumstances of these cases. To hold that the Tribe has authority to zone fee land when the activity on that land has the specified effect on Indian properties would mean that the authority would last

---

[11] JUSTICE BLACKMUN contends that upholding zoning authority does not necessarily "entai[l] a finding of inherent authority for all police powers," reasoning that "[a]s *Montana* itself demonstrates, there may be cases in which tribes assert the power to regulate activities as to which they have no valid interest." *Post,* at 461–462. The errors in this reasoning are twofold. First, JUSTICE BLACKMUN characterizes the decision in *Montana* incorrectly. The Court did not hold in *Montana* that the Tribe had no interest in regulating non-Indian fishing and hunting on fee land. Instead, it held that the Tribe lacked an interest sufficient "to justify tribal regulation." 450 U. S., at 566. Second, JUSTICE BLACKMUN's reasoning confirms, rather than disproves, that recognizing zoning authority here will equate tribal retained sovereignty with the police power. Under JUSTICE BLACKMUN's view, tribes evidently lack authority to exercise a power within the police power only when they have no legitimate interest in the regulation. But this is a meaningless limitation because to be a valid exercise of the police power in the first instance a government regulation must be rationally related to a legitimate state interest. See, *e. g., Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 491 (1955).

only so long as the threatening use continued. If it ceased, zoning power would revert to the county. Under the District Court's interpretation of *Montana*, not only would regulatory authority depend in the first instance on a factual inquiry into how a tribe's interests are affected by a particular use of fee land, but as circumstances changed over time, so, too, would the authority to zone. Conceivably, in a case like this, zoning authority could vest variously in the county and the Tribe, switching back and forth between the two, depending on what uses the county permitted on the fee land at issue. Uncertainty of this kind would not further the interests of either the Tribe or the county government and would be chaotic for landowners.[12]

*Montana* should therefore not be understood to vest zoning authority in the tribe when fee land is used in certain ways. The governing principle is that the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land. The inquiry thus becomes whether, and to what extent, the tribe has a protectible interest in what activities are taking place on fee land within the reservation and, if it has such an interest, how it may be protected. Of course, under ordinary law, neighbors often have a protectible interest in what is occurring on adjoining property and may seek relief in an appropriate forum, judicial or otherwise. *Montana* suggests that in the special circumstances of checkerboard ownership of lands within a reservation, the tribe has an interest under federal law, defined

---

[12] JUSTICE BLACKMUN asserts that his position, that "the general and longer term advantages of comprehensive land management" justify tribal zoning of fee land, avoids this uncertainty. *Post*, at 460. But this broad position would also authorize the Yakima Nation to zone all fee land within reservation boundaries, including that within the incorporated towns of Toppenish, Wapato, and Harrah. Although JUSTICE BLACKMUN purports to avoid this "difficult question," *post*, at 467, n. 9, there appears to be no principled basis on which to exclude the incorporated towns from the Tribe's zoning authority without leading to the very uncertainty JUSTICE BLACKMUN attempts to dismiss as hypothetical, *post*, at 459.

in terms of the impact of the challenged uses on the political integrity, economic security, or the health or welfare of the tribe. But, as we have indicated above, that interest does not entitle the tribe to complain or obtain relief against every use of fee land that has some adverse effect on the tribe. The impact must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe. This standard will sufficiently protect Indian tribes while at the same time avoiding undue interference with state sovereignty and providing the certainty needed by property owners.

Since the tribes' protectible interest is one arising under federal law, the Supremacy Clause requires state and local governments, including Yakima County zoning authorities, to recognize and respect that interest in the course of their activities. The Tribe in this case, as it should have, first appeared in the county zoning proceedings, but its submission should have been, not that the county was without zoning authority over fee land within the reservation, but that its tribal interests were imperiled. The federal courts had jurisdiction to entertain the Tribe's suit for declaratory and injunctive relief,[13] but given that the county has jurisdiction to zone fee lands on the reservation and would be enjoinable only if it failed to respect the rights of the Tribe under federal law, the proper course for the District Court in the Brendale phase of this case would have been to stay its hand until the zoning proceedings had been completed. At that time, a judgment could be made as to whether the uses that were actually authorized on Brendale's property imperiled the political integrity, the economic security, or the health or welfare of the Tribe. If due regard is given to the Tribe's protectible interest at all stages of the proceedings, we have every confidence that the nightmarish consequences predicted by JUSTICE BLACKMUN, *post*, at 460–461, will be avoided. Of course

---

[13] Cf. *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 677 (1974).

if practice proves otherwise, Congress can take appropriate action.

### III

The District Court found that Yakima County's exercise of zoning power over the Wilkinson property would have no direct effect on the Tribe and would not threaten the Tribe's political integrity, economic security, or health and welfare. *Whiteside II*, 617 F. Supp., at 755. On the basis of these findings, it is clear that the Wilkinson development and the county's approval of that development do not imperil any interest of the Yakima Nation. Therefore, I would reverse the judgment of the Ninth Circuit as to the Wilkinson property.

The Brendale property presents a different situation. At the time the Tribe filed its suit, the county had agreed with the Tribe that an EIS was required before Brendale's development could go forward. The zoning proceedings had thus not been concluded, and the District Court's judgment was that the county had no power to go forward. That judgment was infirm under the approach outlined in this opinion. The zoning proceedings should have been allowed to conclude, and it may be that those proceedings would adequately recognize tribal interests and make unnecessary further action in the District Court. If it were otherwise, the District Court could then decide whether the uses the State permits on the Brendale property would do serious injury to, and clearly imperil, the protectible tribal interests identified in this opinion. This part of the case in my view should therefore be returned to District Court. A majority of this Court, however, disagrees with this conclusion.

Accordingly, since with respect to the Wilkinson property, JUSTICE STEVENS and JUSTICE O'CONNOR agree that the judgment of the Court of Appeals in Nos. 87–1697 and 87–1711 should be reversed, that is the judgment of the Court in those cases. With respect to the Brendale property, I would vacate the judgment of the Court of Appeals

and remand the case to the Court of Appeals with instructions to vacate the judgment of the District Court and to remand the case to that Court for further proceedings. Because the Court instead affirms the judgment of the Court of Appeals in No. 87–1622, I dissent as to that case.

The judgment in Nos. 87–1697 and 87–1711 is

*Reversed.*

JUSTICE STEVENS, joined by JUSTICE O'CONNOR, delivered an opinion announcing the judgment of the Court in No. 87–1622 and concurring in the judgment in Nos. 87–1697 and 87–1711.

The United States has granted to many Indian tribes, including the Yakima Nation—"a power unknown to any other sovereignty in this Nation: a power to exclude nonmembers entirely from territory reserved for the tribe." *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 160 (1982) (STEVENS, J., dissenting). That power necessarily must include the lesser power to regulate land use in the interest of protecting the tribal community. Thus, the proper resolution of these cases depends on the extent to which the Tribe's virtually absolute power to exclude has been either diminished by federal statute or voluntarily surrendered by the Tribe itself. The facts of record, which are summarized in JUSTICE WHITE's opinion, *ante*, at, 414–421, dictate a different answer as to the two tracts of land at issue.

I

Zoning is the process whereby a community defines its essential character. Whether driven by a concern for health and safety, esthetics, or other public values, zoning provides the mechanism by which the polity ensures that neighboring uses of land are not mutually—or more often unilaterally—destructive. As Justice Sutherland observed for the Court in the landmark case of *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926), the power to zone closely parallels the common law of nuisance and thus finds guidance in "the maxim

*sic utere tuo ut alienum non laedas*"—use your own property in such a manner as not to injure that of another. *Id.*, at 387. Hence, a community reasonably might conclude that a factory has no place in an otherwise exclusively residential section or that an amusement park does not belong in an area devoted to quiet parks, libraries, and schools. As in nuisance law, the issue is ultimately one of whether the proposed land use is—"like a pig in the parlor instead of the barnyard"—"merely a right thing in the wrong place." *Id.*, at 388.

An Indian tribe's power to exclude nonmembers from a defined geographical area obviously includes the lesser power to define the character of that area. In *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324 (1983), a unanimous Court recognized that "[a] tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established." *Id.*, at 333. Likewise, in *Merrion*, the Court wrote:

> "Nonmembers who lawfully enter tribal lands remain subject to the tribe's *power* to exclude them. This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct . . . . When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its *ultimate* power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry. However, it does not follow that the lawful property right to be on Indian land also immunizes the non-Indian from the tribe's exercise of its lesser-included power . . . to place . . . conditions on the non-Indian's conduct or continued presence on the reservation." 455 U. S., at 144–145 (footnote omitted) (emphasis in original).

It is difficult to imagine a power that follows more forcefully from the power to exclude than the power to require

that nonmembers, as a condition of entry, not disturb the traditional character of the reserved area.

At one time, the Yakima Nation's power to exclude nonmembers from its reservation was near absolute. This power derived from two sources: The Tribe's aboriginal sovereignty over vast reaches of land in the Pacific Northwest and the express provisions of its 1855 treaty with the United States. Even in the absence of a treaty provision expressly granting such authority, Indian tribes maintain the sovereign power of exclusion unless otherwise curtailed. See *Worcester* v. *Georgia*, 6 Pet. 515, 561 (1832); F. Cohen, Handbook of Federal Indian Law 252 (1982) (hereinafter Cohen); 1 Op. Atty. Gen. 465, 465–467 (1821). As is the case with many tribes, see, *e. g.*, *Montana* v. *United States*, 450 U. S. 544, 548 (1981); *Puyallup Tribe, Inc.* v. *Washington Game Dept.*, 433 U. S. 165, 174 (1977), the Yakima Nation's power to exclude was confirmed through an express treaty provision. Through the 1855 treaty, which was ratified by the Senate and proclaimed by President Buchanan in 1859, the Yakima Nation ceded to the United States millions of acres of land east of the main ridge of the Cascade Mountains in exchange for the guarantee that a defined area of approximately 1.3 million acres would be reserved from the ceded lands "for the use and occupation of the aforesaid confederated tribes and bands of Indians." Treaty between the United States and the Yakima Nation of Indians, 12 Stat. 951–952. The treaty provided that the entire "tract shall be set apart . . . for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation," and that no "white man, excepting those in the employment of the Indian Department, [shall] be permitted to reside upon said reservation without permission of the tribe and the superintendent and agent." *Id.*, at 952. Thus, as of 1859, the Tribe's power to exclude was firmly established. The power to regulate land use ran parallel to the power to exclude. Just as the Tribe had authority to limit absolutely access to the reserva-

tion, so it could also limit access to persons whose activities would conform to the Tribe's general plan for land use.

In 1887, however, the Indian General Allotment Act (Dawes Act), 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.*, to some extent reworked fundamental notions of Indian sovereignty. Under the Dawes Act, the President was authorized to allot reservation lands in severalty to resident Indians. Allotted lands were held in trust for members of the Tribe for a period of at least 25 years, after which the members received fee patents and could freely transfer the land to nonmembers. "When all the lands had been allotted and the trusts expired, the reservation could be abolished." *Mattz* v. *Arnett,* 412 U. S. 481, 496 (1973). See also *Moe* v. *Confederated Salish and Kootenai Tribes,* 425 U. S. 463, 478–479 (1976). In this manner, the Dawes Act was designed ultimately to abolish Indian reservations while attempting to bring "security and civilization to the Indian." D. Otis, The Dawes Act and the Allotment of Indian Lands 32 (1973). But, not long after the Act took effect it became apparent that its beneficent purpose had failed, and, in 1934, the Indian Reorganization Act, 48 Stat. 984, repudiated the allotment policy. See Cohen 614. In the interim, however, large portions of reservation lands were conveyed to nonmembers such as petitioners Wilkinson and Brendale.[1]

The Dawes Act did not itself transfer any regulatory power from the Tribe to any state or local governmental authority. See *Moe* v. *Confederated Salish and Kootenai Tribes, supra; Mattz* v. *Arnett, supra.* Nonetheless, by providing for the allotment and ultimate alienation of reservation land, the Act in some respects diminished tribal authority. As we recognized in *Montana* v. *United States,* "treaty

---

[1] About 90 million acres of tribal land were alienated through allotment and sale of surplus lands by 1934, amounting to approximately two-thirds of the total land held by Indian tribes in 1887. See Cohen 614 (citing Office of Indian Affairs, Dept. of Interior, Indian Land Tenure, Economic Status, and Population Trends (1935)).

rights with respect to reservation lands must.be read in light of the subsequent alienation of those lands." 450 U. S., at 561. A statute that authorizes the sale of a parcel of land in a reservation must implicitly grant the purchaser access to that property. In addition, to the extent that large portions of reservation land were sold in fee, such that the Tribe could no longer determine the essential character of the region by setting conditions on entry to those parcels, the Tribe's legitimate interest in land-use regulation was also diminished. Although it is inconceivable that Congress would have intended that the sale of a few lots would divest the Tribe of the power to determine the character of the tribal community, it is equally improbable that Congress envisioned that the Tribe would retain its interest in regulating the use of vast ranges of land sold in fee to nonmembers who lack any voice in setting tribal policy.

Since the Dawes Act provided that individual allotments would be held in trust by the United States for members of the Tribe for a period of at least 25 years, it is evident that the tribal authority over land use within the reservation remained undiminished during that period and at least until actual transfers of land to nonmembers began to occur. The record does not contain a chronology of conveyances of trust lands to nonmembers of the Tribe, but it does disclose the extent of fee ownership of reservation lands at the time these lawsuits began. Most significantly, it establishes that as early as 1954 the Tribe had divided its reservation into two parts, which the parties and the District Court consistently described as the "closed area" and the "open area," and that it continues to maintain the closed area as a separate community. That division, which was made many years before either petitioner Brendale or petitioner Wilkinson acquired title to reservation land, is of critical importance and requires a different disposition of their respective cases.[2]

---

[2] The labels "closed area" and "open area" are, of course, irrelevant to my analysis. What is important is that the Tribe has maintained a defined

## II

Resolutions adopted by the Tribal Council of the Yakima Nation have created what is known officially as the "reservation restricted area," and commonly referred to as the "closed area." Relying on language in the 1855 treaty assuring the Tribe "exclusive use and benefit" of reservation lands, the Council in a 1954 resolution declared "that the open range and forested area of the Yakima Indian Reservation is to *remain* closed to the general public" to protect the area's "grazing, forest, and wildlife resources." Resolution of Yakima Tribal Council (Aug. 4, 1954) (emphasis supplied). Under the 1954 resolution, entry into this area was "restricted to enrolled members of the Yakima Tribe, official agency employees, persons with bona fide property or business interests," close relatives of enrolled members, members of certain other Tribes, and certain permittees. *Ibid.* In addition, the resolution provided that "[e]ntry into closed areas is forbidden all persons while under the influence of liquor." *Ibid.*

Although the closed area occupies about 807,000 acres, consisting of almost two-thirds of the entire reservation, only 25,000 acres are owned in fee. *Yakima Indian Nation* v. *Whiteside*, 617 F. Supp. 735, 741 (ED Wash. 1985). For the most part this area consists of forests, which provide the major source of income to the Tribe. Virtually all of the fee land is owned by lumber companies whose operations are subject to regulation by the Bureau of Indian Affairs (BIA). *Ibid.* Cf. *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980). Excluding the land owned by these lumber companies, the remaining fee land constitutes less than one percent of the closed area. 617 F. Supp., at 741. There are no permanent inhabitants of the Yakima County portion of the closed area. *Id.*, at 742. One state-maintained highway

---

area in which only a very small percentage of the land is held in fee and another defined area in which approximately half of the land is held in fee.

traverses a portion of the area, and several roads maintained by the BIA provide access to the closed area's interior. *Id.*, at 737–738. Apparently, however, the county does not maintain any roads in this portion of the reservation. Cf. *Yakima Indian Nation* v. *Whiteside*, 617 F. Supp. 750, 755 (ED Wash. 1985).

The Tribe operates a "courtesy permit system" that allows selected groups of visitors access to the closed area. In order to protect the area's "'natural foods, medicines,'" and other natural resources, the activities of visitors "are limited to sightseeing, hiking, camping and tribal, BIA or family related business or activity." 617 F. Supp., at 738. Visitors are expressly "prohibited from hunting, fishing, boating, drinking, operating vehicles off established roads, camping at other than designated campsites and removing flora, fauna, petrified wood, other valuable rocks or minerals or artifacts." *Ibid.* Tribal police and game officers enforce the courtesy permit system by monitoring ingress and egress at four guard stations and by patrolling the interior of the closed area. *Ibid.*

Until recently the BIA supported the Tribe's policy of denying entry into the closed area by restricting use of BIA roads to members of the Tribe and a narrowly defined class of permittees. See *ibid.* In litigation with the Government, petitioner Brendale eventually succeeded in establishing a right of access to his own property over BIA roads. See *Brendale* v. *Olney*, No. C–78–145 (ED Wash., Mar. 3, 1981). Moreover, in 1988 the BIA ultimately decided to allow the public to use BIA roads because they had been constructed with public funds. See Letter from James S. Bergmann, Acting Assistant Secretary, Indian Affairs, of April 8, 1988, reprinted in App. to Brief for Petitioner in No. 87–1622, p. 1a. Contrary to the suggestion in JUSTICE WHITE's opinion, see *ante*, at 415–416, n. 2, however, the fact that non-members may now drive on these roads does not change the basic character of the closed area or undermine the Tribe's

historic and consistent interest in preserving the pristine character of this vast, uninhabited portion of its reservation.

Petitioner Brendale's property is located in the heart of this closed portion of the reservation. He inherited the property in 1972 from his mother, who had been an enrolled member of the Yakima Nation. In 1982, Brendale filed a proposal with the Yakima County zoning authorities for the development of a 20-acre subdivision consisting of 10 2-acre lots. BIA roads provide the only access to the property, the nearest county road being more than 20 miles away. The proposal contemplates the construction of recreational summer cabins, on-site sewage disposal systems, and interior access roads that would be maintained by a homeowners' association. 617 F. Supp., at 741. The District Court found that the proposal would have a number of adverse environmental consequences and that the only interest that Yakima County possessed in overseeing the use of the Brendale property was that of "providing regulatory functions to its taxpaying citizens." *Id.*, at 741–743. The county did not appeal from the District Court's decision holding that the Tribe has the exclusive authority to regulate land use in the closed area.[3]

---

[3] Because the county did not appeal, we are not presented with the question whether the county might possess concurrent zoning jurisdiction over the closed area. The possibility that the county might have jurisdiction to prohibit certain land uses in the closed area does not suggest that the Tribe lacks similar authority. This sort of concurrent jurisdiction, if it does exist, is simply a product of the unique overlapping of governmental authority that characterizes much of our Indian-law jurisprudence. See, *e. g., Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163 (1989). Moreover, overlapping land-use regulations are not inherently suspect. The developer of land in the vicinity of an airport, for example, must comply with local zoning laws and federal limitations on the height of buildings that may obstruct air travel. Likewise, federal and state environmental protection requirements may be superimposed on county or tribal zoning ordinances. Although the potential for conflict between a county's rules and a tribe's rules is certainly substantial, it is neither inevitable nor incapable of resolution by a tolerant and cooperative approach to the prob-

Although the logging operations, the construction of BIA roads, and the transfer of ownership of a relatively insignificant amount of land in the closed area unquestionably has diminished the Tribe's power to exclude non-Indians from that portion of its reservation, this does not justify the conclusion that the Tribe has surrendered its historic right to regulate land use in the restricted portion of the reservation. By maintaining the power to exclude nonmembers from entering all but a small portion of the closed area, the Tribe has preserved the power to define the essential character of that area. In fact, the Tribe has exercised this power, taking care that the closed area remains an undeveloped refuge of cultural and religious significance, a place where tribal members "may camp, hunt, fish, and gather roots and berries in the tradition of their culture." Amended Zoning Regulations of the Yakima Indian Nation, Resolution No. 1–98–72, § 23 (1972), reprinted App. 64.

The question is then whether the Tribe has authority to prevent the few individuals who own portions of the closed area in fee from undermining its general plan to preserve the character of this unique resource by developing their isolated parcels without regard to an otherwise common scheme. More simply, the question is whether the owners of the small amount of fee land may bring a pig into the parlor. In my opinion, just as Congress could not possibly have intended in enacting the Dawes Act that tribes would maintain the power to exclude bona fide purchasers of reservation land from that property, it could not have intended that tribes would lose control over the character of their reservations upon the sale of a few, relatively small parcels of land. Neither proposition is explicit in the Dawes Act, yet both appear necessary to a reasonable operation of the allotment process. Cf. *Seymour* v. *Superintendent of Washington State Penitentiary*, 368 U. S. 351, 356 (1962) (allotment "did no more than open

lems that are generated by the continuing growth and complexity of our diverse society.

the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards"); *Mattz* v. *Arnett*, 412 U. S., at 497 (same). In this sense, the Tribe's power to zone is like an equitable servitude; the burden of complying with the Tribe's zoning rules runs with the land without regard to how a particular estate is transferred. Cf. R. Cunningham, W. Stoebuck, & D. Whitman, Law of Property §§ 8.22–8.32, pp. 485–506 (1984) (hereinafter Cunningham). Indeed, there is strong authority for the proposition that equitable servitudes fall within the same family of property law as easements. See C. Clark, Real Covenants and Other Interests Which "Run with Land" 174–175 (1947); Pound, The Progress of the Law, 1918–1919, Equity, 33 Harv. L. Rev. 813 (1920). There is no basis for concluding that the allotted property carried the benefit of one type of "servitude" and not the burden of the other.

In the *Merrion* case, a majority of this Court went a step beyond this narrow recognition of reserved power. There, the Court held that a tribe's power to impose an oil and gas severance tax on non-Indian lessees of reservation land can be derived from the power to exclude. 455 U. S., at 144–148. In reaching this conclusion, the Court rejected the lessee's contention that in leasing the land to the non-Indians the Tribe relinquished the power to exclude and thus the lesser included power to tax. *Id.*, at 146–148. It is not necessary to go this far, however, to decide the present case. Rather, it is enough to recognize that notwithstanding the transfer of a small percentage of allotted land the Tribe retains its legitimate interest in the preservation of the character of the reservation. The Tribe's power to control the use of discrete, fee parcels of the land is simply incidental to its power to preserve the character of what remains almost entirely a region reserved for the exclusive benefit of the Tribe.

Nor does the Court's decision in *Montana* v. *United States*, 450 U. S. 544 (1981), require a different result. First, the *Montana* case involved a discriminatory land-use regulation. *Id.*, at 549. The Tribe's regulation prohibited non-Indians from hunting or fishing on their own property while members of the Tribe were free to engage in those activities. In contrast, petitioners do not suggest that a member of the Tribe would be allowed to undertake the development Brendale proposes. It is Brendale who seeks a special, privileged status. Second, in the *Montana* case we were careful to point out that the conduct of the non-Indians on their fee lands posed no threat to the welfare of the Tribe. *Id.*, at 566. In sharp contrast, in this case the District Court expressly found that Brendale's

> "planned development of recreational housing places critical assets of the Closed Area in jeopardy. . . . [O]f paramount concern to this court is the threat to the Closed Area's cultural and spiritual values. To allow development in this unique and undeveloped area would drastically diminish those intangible values. That in turn would undoubtedly negatively affect the general health and welfare of the Yakima Nation and its members. This court must conclude therefore that the Yakima Nation may regulate the use that Brendale makes of his fee land within the Reservation's Closed Area." 617 F. Supp., at 744.

Finally, in holding in the *Montana* case that the Tribe could not regulate non-Indian fishing and hunting on fee land within the reservation, we stressed that the State of Montana, and not the Tribe, stocked the river with fish and provided a portion of the game found on the reservation. 450 U. S., at 548. In addition, we held that the State owned the bed of the Big Horn River and thus rejected the Tribe's contention that it was entitled to regulate fishing and duck hunting in the river based on its purported ownership interest.

*Id.*, at 550, n. 1, 556–557. No such state or county interest is asserted in this case.

In my view, the fact that a very small proportion of the closed area is owned in fee does not deprive the Tribe of the right to ensure that this area maintains its unadulterated character. This is particularly so in a case such as this in which the zoning rule at issue is neutrally applied, is necessary to protect the welfare of the Tribe, and does not interfere with any significant state or county interest. Although application of the pre-emption analysis advocated by JUSTICE WHITE provides some assurance that the reservation will not be overrun by various uses inconsistent with important tribal interests, it does not provide a means by which the Tribe can continue to define the character of the restricted area. The incremental shifts in the texture and quality of the surrounding environment occasioned by discrete land-use decisions within an expansive territory are not readily monitored or regulated by considering "whether the uses that were actually authorized on [the relevant] property imperiled the political integrity, the economic security, or the health or welfare of the Tribe." *Ante,* at 431.

I therefore agree with JUSTICE BLACKMUN that the Tribe may zone the Brendale property. The judgment of the Court of Appeals is accordingly affirmed in No. 87–1622.

## III

The authority of the Tribe to enact and enforce zoning ordinances applicable in the open area—where petitioner Wilkinson's property is located—requires a different analysis. Although the Tribe originally had the power to exclude non-Indians from the entire reservation, the "subsequent alienation" of about half of the property in the open area has produced an integrated community that is not economically or culturally delimited by reservation boundaries. Because the Tribe no longer has the power to exclude nonmembers from a large portion of this area, it also lacks the power to

define the essential character of the territory. As a result, the Tribe's interest in preventing inconsistent uses is dramatically curtailed. For this reason, I agree with JUSTICE WHITE that the Tribe lacks authority to regulate the use of Wilkinson's property. So long as the land is not used in a manner that is pre-empted by federal law, the Tribe has no special claim to relief. It, of course, retains authority to regulate the use of trust land, and the county does not contend otherwise. See Brief for Petitioners in No. 87–1711, p. 12.

Unlike the closed area, the Tribe makes no attempt to control access to the open area. In this respect, the District Court found that "access to the area is not limited by the Yakima Nation and non-tribal members move freely throughout the area." 617 F. Supp., at 752. The county has constructed and maintained 487 miles of road, all of which are equally accessible to reservation residents and the general public. App. to Pet. for Cert. in No. 87–1697, p. 87a. Although the Tribe has asserted that it has the authority to regulate land use in the three incorporated towns, it has never attempted to do so. In "sharp contrast to the pristine, wilderness-like character of the 'Closed Area,'" the open area is marked by "residential and commercial developmen[t]." 617 F. Supp., at 752.

Members of the Yakima Nation represent less than 20 percent of the open area's total population.[4] *Id.*, at 755. Indians and non-Indians alike are eligible to vote in county elections. Only enrolled members of the Tribe, however, are entitled to participate in tribal elections. 2 Tr. 167. Similarly, while the county provides police protection, public education, and other social services to both Indians and non-Indians, App. to Pet. for Cert. in No. 87–1697, p. 88a; 4 Tr. 546–547, government services provided by the Tribe—

---

[4] According to the 1980 Census, the total population of the portion of the Yakima Reservation within Yakima County is 24,750, of whom 4,908 are Indians. U. S. Dept. of Commerce, Bureau of Census, 1980 Census of Population 49—460 (Table 192) (1983).

although theoretically available to all residents — are in practice generally used only by members of the Tribe. 2 Tr. 143–144. Furthermore, the District Court found that the county has a substantial interest in regulating land use in the open area — and in particular in protecting "the county's valuable agricultural land" — and that the open area lacks "a unique religious or spiritual significance to the members of the Yakima Nation." 617 F. Supp., at 755.

In contrast to the closed area, almost half of the land in the open area is owned in fee. *Id.*, at 752. The majority of the fee land is located in three incorporated towns in the open area, where approximately 10,000 of the open area's 25,000 residents live. *Id.*, at 752, 755. The remaining portion of the open area, which includes approximately 143,000 acres of irrigated farm land, is largely devoted to agriculture. 3 Tr. 416. About 63,179 acres of this farm land are owned in fee by nonmembers. *Id.*, at 422. Another 67,466 acres of this land are owned by the Yakima Nation or its members, but are leased to non-Indians. *Ibid.* Only 12,355 acres are farmed by tribal members. Petitioner "Wilkinson's property is bordered to the north by trust land and to the east, south and west by fee land." 617 F. Supp., at 754. The 40-acre lot overlooks the Yakima Municipal Airport and is composed of unfarmed, sagebrush land. *Ibid.*

Given that a large percentage of the land in the open area is owned in fee by nonmembers — and that an additional portion is leased to nonmembers — even if the Tribe had exercised its power to exclude nonmembers from trust land, it would have been unable thereby to establish the essential character of the region. In such circumstances, allowing a nonmember to use his or her land in a manner that might not be approved by the tribal council does not upset an otherwise coherent scheme of land use. The Tribe cannot complain that the nonmember seeks to bring a pig into the parlor, for, unlike the closed area, the Tribe no longer possesses the power to determine the basic character of the area. More-

over, it is unlikely that Congress intended to give the Tribe the power to determine the character of an area that is predominantly owned and populated by nonmembers, who represent 80 percent of the population yet lack a voice in tribal governance. Finally, to the extent the open area has lost its character as an exclusive tribal resource, and has become, as a practical matter, an integrated portion of the county, the Tribe has also lost any claim to an interest analogous to an equitable servitude. Under the "change of neighborhood" doctrine, an equitable servitude lapses when the restriction, as applied to "the general vicinity and not merely a few parcels," has "become outmoded," has "lost its usefulness," or has become "'inequitable' to enforce." Cunningham § 8.20, pp. 482–483. See also Restatement of Property § 564 (1944). Because the open area no longer maintains the character of a unique tribal asset and because the Tribe accordingly lacks a substantial interest in governing land use, the power to zone has "become outmoded."

I therefore agree with JUSTICE WHITE's conclusion that the Tribe lacks authority to zone the Wilkinson property.

## IV

My conclusion that the dramatically different facts of these two cases should produce different results is subject to the obvious criticism that it does not identify a bright-line rule. The primary responsibility for line-drawing, however, is vested in the legislature. Moreover, line-drawing is inherent in the continuum that exists between those reservations that still maintain their status as distinct social structures and those that have become integrated in other local polities. Any difficulty courts may encounter in drawing the line between "closed" and "open" portions of reservations simply reflects that the factual predicate to these cases is itself complicated. Indeed, JUSTICE WHITE's rule does little to avoid the difficulty of drawing lines and making subtle distinctions. Just as it is neither possible nor appropriate in these cases to set

a fixed percentage of fee ownership that will govern every case that may arise, so is it impossible to articulate precise rules that will govern whenever a tribe asserts that a land use approved by a county board is pre-empted by federal law. And although the rule that JUSTICE BLACKMUN proposes would provide an obvious answer in most cases, he recognizes that "[i]t may be that on some reservations, including the Yakima Reservation, there are essentially self-contained, definable, areas in which non-Indian fee lands so predominate that the tribe has no significant interest in controlling land use." *Post*, at 467, n. 9. Finally, it would be fundamentally unfair to deny appropriate relief to either party in these cases, which involves no difficulty in discerning the proper line, simply because a future case may be more difficult.

Accordingly, in No. 87–1622, the judgment of the Court of Appeals is affirmed. I concur in the judgment in Nos. 87–1697 and 87–1711 reversing the judgment of the Court of Appeals.

The judgment in No. 87–1622 is

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in the judgment in No. 87–1622 and dissenting in Nos. 87–1697 and 87–1711.

The Court's combined judgment in these consolidated cases — splitting tribal zoning authority over non-Indian fee lands between the so-called "open" and "closed" areas of the Yakima Indian Reservation — is Solomonic in appearance only. This compromise result arises from two distinct approaches to tribal sovereignty, each of which is inconsistent with this Court's past decisions and undermines the Federal Government's longstanding commitment to the promotion of tribal autonomy. Because the Court's judgment that the Tribe does not have zoning authority over non-Indian fee lands in the "open" area of its reservation is wrong, in my view, as a matter of law and fashions a patently unworkable legal rule, I dissent in Nos. 87–1697 and 87–1711. Because

JUSTICE STEVENS' opinion reaches the right result for the wrong reason with respect to the Tribe's authority to zone non-Indian fee lands in the closed portion of the reservation, I concur in the judgment in No. 87–1662. I shall discuss JUSTICE WHITE's and JUSTICE STEVENS' opinions *seriatim*.

I

Eight years ago, this Court decided *Montana* v. *United States*, 450 U. S. 544 (1981). In that case, it was ruled that an Indian Tribe did not have the inherent authority to prohibit non-Indian hunting and fishing on fee lands located on a reservation and owned by a non-Indian, where the Tribe did not assert that any right or interest was infringed or affected by the non-Indian conduct. Today, with what seems to me to be no more than a perfunctory discussion of this Court's decisions both before and after *Montana*, JUSTICE WHITE's opinion reads that case as establishing a general rule, modified only by two narrow exceptions, that Indian tribes have no authority over the activities of non-Indians on their reservations absent express congressional delegation. *Ante*, at 425–426.

Applying this rule, JUSTICE WHITE further suggests that *Montana*'s "second exception," which recognizes inherent tribal authority over non-Indian conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," 450 U. S., at 566, does not extend to the right of an Indian tribe to make rational and comprehensive land-use decisions for its reservation. Such a holding would guarantee that adjoining reservation lands would be subject to inconsistent and potentially incompatible zoning policies, and for all practical purposes would strip tribes of the power to protect the integrity of *trust* lands over which they enjoy unquestioned and exclusive authority.

*Montana* need not, and should not, be read to require such an absurd result. When considered in the full context of the

Court's other relevant decisions, it is evident that *Montana* must be read to recognize the inherent authority of tribes to exercise civil jurisdiction over non-Indian activities on tribal reservations where those activities, as they do in the case of land use, implicate a significant tribal interest.

A

JUSTICE WHITE's opinion reiterates a "general principle" it finds in *Montana* that Indian tribes have no authority over the activities of non-Indians absent express congressional delegation. *Ante,* at 426. Concededly, the Court in *Montana* suggested that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." 450 U. S., at 564. But *Montana* is simply one, and not even the most recent, of a long line of our decisions discussing the nature of inherent tribal sovereignty. These cases, landmarks in 150 years of Indian-law jurisprudence, establish a very different "general principle" governing inherent tribal sovereignty—a principle according to which tribes *retain* their sovereign powers over non-Indians on reservation lands unless the exercise of that sovereignty would be "inconsistent with the overriding interests of the National Government." See, *e. g., Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 153 (1980). *Montana,* and specifically the two "exceptions" that *Montana* recognizes to its anomalous "general principle," must be read against the rich and extensive background of these cases. When so considered, it is clear to me that nothing in *Montana* precludes, and indeed *Montana* contemplates, the exercise of civil jurisdiction over non-Indian activities on a tribal reservation, including the power to zone fee lands, where those non-Indian reservation activities implicate a significant tribal interest.

## 1

The crucial step in the process of interpreting *Montana*, and the step that JUSTICE WHITE's opinion neglects, is to place that case in the spectrum of what came before and after it. From a time long before the 13 Colonies declared their independence from England, European nations recognized the native tribes of this continent as self-governing, sovereign, political communities. From this Court's earliest jurisprudence immediately after the American Revolution, it followed the settled understanding of international law that the sovereignty of the individual tribes, "domestic dependent nations" that placed themselves under the protection of the United States, survived their incorporation within the United States, except as *necessarily* diminished.[1] In the landmark *Cherokee Cases*, this Court, through Chief Justice Marshall, held that the dependent status of the tribes divested them only of those aspects of their sovereignty—in particular the authority to engage in governmental relations with foreign powers and the power to alienate land to non-Indians—that were inherently inconsistent with the paramount authority of the United States.[2]

Our approach to inherent tribal sovereignty remained essentially constant in all critical respects in the century and a half between John Marshall's first illumination of the subject and this Court's *Montana* decision. Time and again we stated that, while Congress retains the authority to abrogate tribal sovereignty as it sees fit, tribal sovereignty is not implicitly divested except in those limited circumstances

---

[1] F. Cohen, Handbook of Federal Indian Law 235 (1982). See also *Worcester* v. *Georgia*, 6 Pet. 515, 560–561 (1832): "[T]he settled doctrine of the law of nations is, that a weaker power does not surrender its independence—its right to self-government, by associating with a stronger, and taking its protection. A weak state, in order to provide for its safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state."

[2] See *Cherokee Nation* v. *Georgia*, 5 Pet. 1 (1831); *Worcester* v. *Georgia*, 6 Pet. 515 (1832); see also *Johnson* v. *McIntosh*, 8 Wheat. 543 (1823).

principally involving external powers of sovereignty where the exercise of tribal authority is *necessarily* inconsistent with the tribes' dependent status. See, *e. g., United States v. Wheeler*, 435 U. S. 313, 326 (1978) (implicit divestiture only of powers "necessarily . . . lost by virtue of a tribe's dependent status"); *Colville*, 447 U. S., at 153–154 (implicit divestiture only "where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights").[3]

---

[3] JUSTICE WHITE's opinion asserts that *Wheeler* "made clear" that all tribal regulatory authority over relations with non-Indians is necessarily inconsistent with their dependent status and, therefore, divested. *Ante*, at 427. *Wheeler* says no such thing, as is clear when JUSTICE WHITE's opinion's selective quotation is placed in context. The issue in *Wheeler* was whether the conviction of an Indian in tribal court on a charge of contributing to the delinquency of a minor was a federal prosecution such that a second criminal proceeding arising from the same incident would be barred under the Double Jeopardy Clause. The resolution of this issue turned on whether the Tribe's criminal jurisdiction over the Indian defendant stemmed from its own inherent authority or, instead, from federal authority delegated to the Tribe by Congress. After discussing at some length the general rule that Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status, 435 U. S., at 323, the Court held that the Tribe retained inherent authority to punish Indian offenders. The Court first noted that Congress, far from divesting tribes of this power, had consistently recognized it. The Court then turned to the question whether criminal jurisdiction was necessarily divested by virtue of the dependent status of the tribes. The Court stated:

"[T]he sovereign power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians

Indeed, what is most remarkable about this Court's jurisprudence of inherent tribal sovereignty is that, except for those few aspects of sovereignty recognized in the *Cherokee Cases* as necessarily divested, the Court only once prior to *Montana* (and never thereafter) has found an additional sovereign power to have been relinquished upon incorporation. In *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191 (1978), we held that tribes have no inherent criminal jurisdiction over non-Indians in tribal court. In light of the nearly universal understanding dating from the origins of this country's dealings with the tribes that they do not possess criminal jurisdiction over non-Indians except as permitted by treaty, and in light of the Federal Constitution's extraordinary protections against intrusions on personal liberty, we concluded that inherent criminal jurisdiction over non-Indians is inconsistent with the dependent status of the tribes. *Id.*, at 208–212. But our decision in *Colville*, which was subsequent to *Oliphant*, expressly establishes that nothing in *Oliphant* negates our historical understanding that the

the land they occupy. . . . They cannot enter into direct commercial or governmental relations with foreign nations. And, as we have recently held, they cannot try nonmembers in tribal courts.

"These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the power of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe." *Id.*, at 326 (citations omitted).

Clearly, nothing in this discussion suggests that tribes have lost all inherent sovereignty over tribal relations with non-Indians. (Indeed, the Court in *Wheeler* had no cause to address this issue.) *Wheeler* simply stands for the uncontroversial proposition that those specific aspects of inherent sovereignty that necessarily have been divested (criminal jurisdiction over non-Indians, alienation of land, and foreign relations) involve tribal relations with non-Indians. Notably, JUSTICE WHITE's proposed reading of *Wheeler* is in direct conflict with *Montana*, which explicitly recognizes that tribes retain some inherent authority over non-Indians. *Montana* v. *United States*, 450 U. S. 544, 565–566 (1981).

tribes retain substantial *civil* jurisdiction over non-Indians.[4] We there observed that the Federal Government explicitly had recognized for more than a century that "Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest," 447 U. S., at 152, and noted that the historical understandings regarding civil jurisdiction "differ sharply" from those underlying *Oliphant*. 447 U. S., at 153 (upholding inherent tribal authority to tax on-reservation cigarette sales to non-Indians).

Our civil jurisdiction cases subsequent to *Montana* have reaffirmed this view: we have held without equivocation that tribal civil jurisdiction over non-Indians on reservation lands is not an aspect of tribal sovereignty necessarily divested by reason of the tribes' incorporation within the dominant society. In *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982), we upheld a tribe's inherent authority to impose a severance tax on non-Indian mining on the reservation. This taxing authority, even over non-Indians, we wrote, is an "inherent power necessary to tribal self-government and territorial management." *Id.*, at 141. And in *Iowa Mutual Ins. Co.* v. *LaPlante*, 480 U. S. 9 (1987), we noted: "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. . . . Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Id.*, at 18 (citations omitted).[5]

---

[4] Our understanding is consistent with the definitive administrative interpretation of inherent Indian sovereignty: "But over all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders, the tribe has the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business." *Powers of Indian Tribes*, 55 I. D. 14, 50 (1934).

[5] JUSTICE WHITE would read *Iowa Mutual Ins. Co.* v. *LaPlante* as not reaching the question whether tribal courts have civil jurisdiction over non-Indians, and dismisses the case as establishing no

These cases, like their predecessors, clearly recognize that tribal civil jurisdiction over non-Indians on reservation lands is consistent with the dependent status of the tribes.

### 2

Given this background, how should we read *Montana,* where the Court held that the Tribe had no inherent authority to prohibit non-Indians from hunting and fishing on fee lands within the reservation? With respect to *Montana's* "general principle" creating a presumption against tribal civil jurisdiction over non-Indians absent express congressional delegation, I find it evident that the Court simply missed its usual way. Although the Court's opinion reads as a restatement, not as a revision, of existing doctrine, it contains language flatly inconsistent with its prior decisions defining the scope of inherent tribal jurisdiction, *e. g., Colville.* Notably, in support of its anomalous "general principle," the *Montana* opinion relies mainly on a line of state-law pre-emption cases that address the issue—irrelevant to the issue of inherent tribal sovereignty—as to when *States* may exercise jurisdiction over non-Indian activities on a reservation. See *Montana,* 450 U. S., at 564–566, citing *Fisher* v. *District Court of Sixteenth Judicial District of Montana,* 424 U. S. 382, 386 (1976); *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148 (1973); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 171 (1973); and *Williams* v. *Lee,* 358 U. S. 217,

---

more than an "exhaustion rule" permitting tribal courts to determine their jurisdiction, or lack thereof, in the first instance. *Ante,* at 427, n. 10. See also *National Farmers Union Ins. Cos.* v. *Crow Tribe,* 471 U. S. 845 (1985). JUSTICE WHITE, however, has read too little. In holding that the issue of jurisdiction over a civil suit brought against a non-Indian arising from a tort occurring on reservation land must be resolved in the tribal courts in the first instance, *Iowa Mutual* does reaffirm the exhaustion rule established in *National Farmers Union.* But *Iowa Mutual* also stands for the proposition that civil jurisdiction over non-Indians *is* a recognized part of inherent tribal sovereignty and exists "unless affirmatively limited by a specific treaty provision or federal statute." 480 U. S., at 18.

219–220 (1959). Not surprisingly, and of critical importance for deciding the instant cases, the *Montana* presumption has found no place in our subsequent decisions discussing inherent sovereignty.[6] See *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324 (1983); *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845 (1985); *Iowa Mutual Ins. Co.*, *supra*.

But to recognize that *Montana* strangely reversed the otherwise consistent presumption in favor of inherent tribal sovereignty over reservation lands is not to excise the decision from our jurisprudence. Despite the reversed presumption, the plain language of *Montana* itself expressly preserves substantial tribal authority over non-Indian activity on reservations, including fee lands, and, more particularly, may sensibly be read as recognizing inherent tribal authority to zone fee lands.

*Montana* explicitly recognizes that tribes "retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." 450 U. S., at 565. Specifically, *Montana* holds that tribes have civil jurisdiction over non-Indians who enter "contracts, leases or other arrangements" with the tribe, *ibid.*, and over non-Indian conduct which "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," even if that conduct occurs on fee lands. *Id.*, at 566. Thus, despite *Montana's* reversal of the usual presumption in favor of inherent sovereignty over reservation activity, the decision reasonably may be read, and, in my view, should be read, to recog-

---

[6] Indeed, the only citations that I have found of *Montana's* rule governing tribal sovereignty appear in the dissent to our decision upholding tribal taxing authority over non-Indians in *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 171 (1982), and in a dissent from the denial of certiorari in a case where the Court of Appeals upheld tribal civil jurisdiction over non-Indians. *City of Polson* v. *Confederated Salish and Kootenai Tribes*, 459 U. S. 977 (1982).

nize that tribes may regulate the on-reservation conduct of non-Indians whenever a significant tribal interest is threatened or directly affected. So construed, *Montana* fits with relative ease into the constellation of this Court's sovereignty jurisprudence.

Under this approach, once the tribe's valid regulatory interest is established, the nature of land ownership does not diminish the tribe's inherent power to regulate in the area. This, too, is consistent with our cases. The Court has affirmed and reaffirmed that tribal sovereignty is in large part geographically determined. "Indian tribes," we have written, "are unique aggregations possessing attributes of sovereignty over both their members *and their territory*." *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975) (emphasis added); see also *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 151 (1980) ("The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty"). We have held that lands obtained under the allotment policy, which permitted non-Indians to purchase lands located within reservations, remain part of those reservations unless Congress explicitly provides to the contrary, *e. g., Mattz* v. *Arnett*, 412 U. S. 481, 498–499 (1973), and that tribal jurisdiction cannot be considered to vary between fee lands and trust lands; the resulting "'impractical pattern of checkerboard jurisdiction'" would be contrary to federal statute and policy. *Moe* v. *Confederated Salish and Kootenai Tribes*, 425 U. S. 463, 478 (1976), quoting *Seymour* v. *Superintendent of Washington State Penitentiary*, 368 U. S. 351, 358 (1962). Thus, in *Merrion*, a post-*Montana* case, we cited with approval the Court of Appeals decision in *Buster* v. *Wright*, 135 F. 947 (CA8 1905), appeal dism'd, 203 U. S. 599 (1906), affirming the right of the Tribe to tax non-Indians on non-Indian-owned fee lands: "'[n]either the United States, nor a state, nor any other sovereignty loses the power to govern the people within its borders by the existence of towns and cities therein endowed

with the usual powers of municipalities, *nor by the ownership nor occupancy of the land within its territorial jurisdiction by citizens or foreigners.'"* *Merrion,* 455 U. S., at 143, quoting *Buster* v. *Wright,* 135 F., at 952 (emphasis added in *Merrion*).

It would be difficult to conceive of a power more central to "the economic security, or the health or welfare of the tribe," *Montana,* 450 U. S., at 566, than the power to zone. "I am in full agreement with the majority that zoning . . . may indeed be the most essential function performed by local government." *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, 13 (1974) (MARSHALL, J., dissenting), quoted in part and with approval in *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 80 (1976) (concurring opinion). This fundamental sovereign power of local governments to control land use is especially vital to Indians, who enjoy a unique historical and cultural connection to the land. See, *e. g., FPC* v. *Tuscarora Indian Nation,* 362 U. S. 99, 142 (1960) (Black, J., dissenting). And how can anyone doubt that a tribe's inability to zone substantial tracts of fee land within its own reservation—tracts that are inextricably intermingled with reservation trust lands—would destroy the tribe's ability to engage in the systematic and coordinated utilization of land that is the very essence of zoning authority? See N. Williams, American Land Planning Law § 1.08 (1988). In *Merrion,* we held that the power to impose a severance tax on non-Indian oil and gas producers on the reservation was "an inherent power necessary to tribal self-government and territorial management." 455 U. S., at 141. I am hard pressed to find any reason why zoning authority, a critical aspect of self-government and the ultimate instrument of "territorial management," should not be deemed to lie within the inherent sovereignty of the tribes as well. Thus, if *Montana* is to fit at all within this Court's Indian sovereignty jurisprudence, zoning authority—even over fee lands—must fall within the scope of tribal jurisdiction under *Montana.*

A finding of inherent zoning authority here would in no way conflict with *Montana's* actual holding. As we explicitly recognized in *Mescalero Apache,* 462 U. S., at 331, n. 12, the critical difficulty in *Montana* was the Tribe's failure even to allege that the non-Indians whose fishing and hunting it sought to regulate were in any measure affecting an identifiable tribal interest. See 450 U. S., at 558, n. 6. Indeed, *Montana,* as it subsequently appears in our cases, stands for no more than that tribes may not assert their civil jurisdiction over nonmembers on fee lands absent a showing that, in *Montana's* words, the non-Indians' "conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.,* at 566.

### 3

JUSTICE WHITE's opinion rejects this reading of *Montana* for several reasons, none of which withstand scrutiny. First, his opinion notes that *Montana's* recognition of tribal sovereignty over non-Indian conduct that threatens the political and economic integrity or health or welfare of the tribe is prefaced by the word "may"—a linguistic turn that the majority reads as suggesting that such tribal sovereignty is not always retained. *Ante,* at 428. Read in context, I think it clear that the Court's use of the word "may" was not an expression of doubt about the existence of tribal sovereignty under the enumerated circumstances, but, rather, was a reflection of the obvious fact that the comment was pure dictum. A more definitive statement on an issue not presented in the case surely would have been inappropriate.

Second, JUSTICE WHITE's opinion suggests that applying *Montana's* language literally to the problem of zoning fee lands would create the peculiar, and untenable, situation of having zoning authority vary over time between the tribe and the State depending on what effect a proposed land use might have on the tribe. *Ante,* at 429–430. This hypothetical problem is entirely of JUSTICE WHITE's own creation.

*Montana*'s literal language does not require, as he claims, a parcel-by-parcel, use-by-use determination whether a proposed use of fee land will threaten the political integrity, economic security, or health or welfare of the tribe. The threat to the tribe does not derive solely from the proposed uses of specific parcels of fee lands (which admittedly would vary over time and place). The threat stems from the loss of the general and longer term advantages of comprehensive land management.

What the majority offers the tribes falls far short of meeting their legitimate needs. JUSTICE WHITE's opinion fashions a newfangled federal nuisance-type cause of action by which the tribe may bring suit in federal court to enjoin a particular proposed land use that seriously imperils the political integrity, economic security, or health or welfare of the tribe. *Ante*, at 431–432. While resort to this proposed cause of action may ultimately prevent blatantly abusive non-Indian uses of reservation lands, the opportunity to engage in protracted litigation over every proposed land use that conflicts with tribal interests does nothing to recognize the tribe's legitimate sovereign right to regulate the lands within its reservation, with the view to the long-term, active management of land use that is the very difference between zoning and case-by-case nuisance litigation.

JUSTICE WHITE's opinion also claims that it is acting here to protect the expectations of landowners. I agree that the need for certainty in zoning laws is a valid concern. But if JUSTICE WHITE's true concern were with practical consequences, he would never adopt the rule he proposes today. Because we know that the Tribe, and only the Tribe, has authority to zone the trust lands within the reservation, JUSTICE WHITE's opinion, and a majority of the Court with respect to the "open" area, have established a regime that guarantees that neither the State nor the Tribe will be able to establish a comprehensive zoning plan. Although under the majority's rule landowners may be certain as to which

zoning authority controls the use of their land, adjoining parcels of land throughout the "open" area of the reservation (and throughout the entire reservation under JUSTICE WHITE's theory) will be zoned by different zoning authorities with competing and perhaps inconsistent land-use priorities.[7] This, in practice, will be nothing short of a nightmare, nullifying the efforts of both sovereigns to segregate incompatible land uses and exacerbating the already considerable tensions that exist between local and tribal governments in many parts of the Nation about the best use of reservation lands.

In any event, JUSTICE WHITE's opinion does not really explain why the general inability of a tribe to control land use on numerous tracts of land interspersed across its reservation does not inherently threaten the political integrity, economic security, or health or welfare of the tribe. Instead, the opinion claims that to hold that tribes have inherent zoning power over non-Indian fee lands would be to hold that tribes can exercise every police power over such lands, and that such a holding is contrary to the result in *Montana* itself. *Ante,* at 428–429.

This concern is misplaced. It does not necessarily follow that a finding of inherent zoning authority over fee lands on a checkerboarded reservation, an authority indispensable to the fulfillment of a tribe's uncontested right to zone its trust lands, also entails a finding of inherent authority for all police powers. As *Montana* itself demonstrates, there may be cases in which tribes assert the power to regulate activi-

---

[7] The checkerboarding problem is evident in this case: Wilkinson's property is bounded by trust land to the north, and fee land to the south, east, and west. *Yakima Indian Nation* v. *Whiteside,* 617 F. Supp. 750, 754 (ED Wash. 1985). Other fee lands are "scattered throughout the reservation in a checkerboard pattern." *Confederated Tribes and Bands of Yakima Indian Nation* v. *Whiteside,* 828 F. 2d 529, 531 (CA9 1987).

ties as to which they have no valid interest.[8]   Zoning is clearly not such a case.

4

In short, it is my view that under all of this Court's inherent sovereignty decisions, including *Montana*, tribes retain the power to zone non-Indian fee lands on the reservation. JUSTICE WHITE's opinion presents not a single thread of logic for the proposition that such zoning power is inconsistent with the overriding interest of the National Government, and therefore necessarily divested, or that such zoning power is not fundamental to the political and economic security of the tribe, and therefore reserved to the tribe by the plain language of *Montana*.   Instead, at the expense of long-recognized tribal rights, many of our precedents, and 150 years of federal policy, JUSTICE WHITE's opinion replaces sovereignty with a form of legal tokenism: the opportunity to sue in court has replaced the opportunity to exercise sovereign authority.   This substitution is without sound basis in law, and without practical value.

B

While JUSTICE WHITE's opinion misreads the Court's decisions defining the limits of inherent tribal sovereignty, JUSTICE STEVENS' opinion disregards those decisions altogether. By grounding the Tribe's authority to zone non-Indian fee lands exclusively in its power to exclude non-Indians from the reservation, and by refusing even to consider whether the Tribe's inherent authority might support the zoning of non-Indian fee lands in the "open area," JUSTICE STEVENS' opinion appears implicitly to conclude that tribes have no inherent authority over non-Indians on reservation lands.   As

---

[8] "The complaint in this case did not allege that non-Indian hunting and fishing on reservation lands has impaired" the tribe's hunting and fishing rights.  *Montana*, 450 U. S., at 558, n. 6.   Moreover, the complaint "did not allege that non-Indian hunting and fishing on fee lands imperil[ed] the subsistence or welfare of the Tribe." *Id.*, at 566.

is evident from my discussion of JUSTICE WHITE's opinion, this conclusion stands in flat contradiction to every relevant Indian sovereignty case that this Court has decided.

JUSTICE STEVENS' opinion also is at odds with this Court's reservation disestablishment decisions. See, *e. g.*, *Seymour* v. *Superintendent of Washington State Penitentiary*, 368 U. S. 351 (1962); *Mattz* v. *Arnett*, 412 U. S. 481 (1973); *Moe* v. *Confederated Salish and Kootenai Tribes*, 425 U. S. 463 (1976). JUSTICE STEVENS distinguishes between the "open" and "closed" areas of the reservation on the ground that Congress, in enacting the Dawes Act, could not have intended for tribes to maintain zoning authority over non-Indian fee lands where, as in the "open area" of the Yakima Reservation, the allotment of reservation lands "has produced an integrated community that is not economically or culturally delimited by reservation boundaries." *Ante*, at 444. I fail to see how this distinction can be squared with this Court's decisions specifically rejecting arguments that those reservation areas where the Dawes Act has resulted in substantial non-Indian land ownership should be treated differently for jurisdictional purposes from those areas where tribal holdings predominate. See, *e. g.*, *Seymour*, 368 U. S., at 357–359. And I do not see how JUSTICE STEVENS' theory can be squared with the unequivocal holdings of our cases that the Dawes Act did not diminish the reservation status of reservation lands alienated to non-Indian owners even where that part of the reservation had "'lost its [Indian] identity.'" See, *e. g.*, *Mattz*, 412 U. S., at 484–485.

Precedents aside, JUSTICE STEVENS' opinion points to no authority, either in the text of the Dawes Act or its legislative history, in support of its critical conjecture that "[a]lthough it is inconceivable that Congress would have intended that the sale of a few lots would divest the Tribe of the power to determine the character of the tribal community, it is equally improbable that Congress envisioned that the Tribe would retain its interest in regulating the use of vast ranges

of land sold in fee to nonmembers who lack any voice in setting tribal policy." *Ante,* at 437; see also *ante,* at 446–447. Moreover, even if JUSTICE STEVENS is right about congressional intent at the time of the Dawes Act, why should this matter? "The policy of allotment and sale of surplus reservation land was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, now amended and codified as 25 U. S. C. § 461 *et seq.*" *Mattz,* 412 U. S., at 496, n. 18; see also *Moe,* 425 U. S., at 479. Surely, in considering whether Congress intended tribes to enjoy civil jurisdiction, including zoning authority, over non-Indian fee lands in reservation areas where non-Indian ownership predominates, this Court should direct its attention not to the intent of the Congress that passed the Dawes Act, but rather to the intent of the Congress that repudiated the Dawes Act, and established the Indian policies to which we are heir. This 1934 Congress, as definitively interpreted by the Executive Branch at the time, intended that tribal civil jurisdiction extend over " 'all the lands of the reservation, whether owned by the tribe, by members thereof, or by outsiders.' " See n. 4, *supra,* quoting *Powers of Indian Tribes,* 55 I. D. 14, 50 (1934).

On a practical level, JUSTICE STEVENS' approach to zoning authority poses even greater difficulties than JUSTICE WHITE's approach. JUSTICE STEVENS' opinion not only would establish a self-defeating regime of "checkerboard" zoning authority in "open" areas of every reservation, but it would require an intrinsically standardless threshold determination as to when a section of a reservation contains sufficient non-Indian land holdings to warrant an "open" classification. JUSTICE STEVENS' opinion suggests no benchmark for making this determination, and I can imagine none.

Moreover, to the extent that JUSTICE STEVENS' opinion discusses the characteristics of a reservation area where the Tribe possesses authority to zone because it has preserved the "essential character of the reservation," these characteristics betray a stereotyped and almost patronizing view

of Indians and reservation life. The opinion describes the "closed area" of the Yakima Reservation as "pristine," and emphasizes that it is spiritually significant to the Tribe and yields natural foods and medicines. *Ante*, at 439, 439–440. The opinion then contrasts this unadulterated portion of the reservation with the "open area," which is "marked by 'residential and commercial developmen[t].'" *Ante*, at 445 (citation omitted). In my view, even under JUSTICE STEVENS' analysis, it must not be the case that tribes can retain the "essential character" of their reservations (necessary to the exercise of zoning authority), *ibid.*, only if they forgo economic development and maintain those reservations according to a single, perhaps quaint, view of what is characteristically "Indian" today.

In sum, because JUSTICE STEVENS' opinion proposes an approach to tribal authority radically different from, and inconsistent with, our past decisions, because this approach rests on irrelevant conjecture about congressional intent, and because the approach is generally unsound, I cannot concur even partially in JUSTICE STEVENS' opinion, however partially attractive its results. Our past decisions and common sense compel a finding that the Tribe has zoning authority over all the lands within its reservation.

## II

Having concluded that the Tribe has the inherent authority to zone non-Indian fee lands, the question remains whether this authority is exclusive or whether it is coextensive with the authority of the State acting through the county. This is not the place for an extended discussion of Indian preemption law. Suffice it to say that our cases recognize that the States have authority to exercise jurisdiction over non-Indian activities on the reservation, see, *e. g., New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324 (1983), but that this authority is pre-empted if it either "unlawfully infringe[s] 'on the right of reservation Indians to make their own

laws and be ruled by them,'" *White Mountain Apache,* 448 U. S., at 142, quoting *Williams* v. *Lee,* 358 U. S., at 220, or "interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority," *Mescalero Apache,* 462 U. S., at 334. Applying this test, the Court has recognized coextensive state and tribal civil jurisdiction where the exercise of concurrent authority does not do violence to the rights of either sovereign. See, *e. g., Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134 (1980) (state taxation of on-reservation cigarette purchases does not intrude upon or diminish the Tribe's authority also to tax).

In my view, however, concurrent zoning jurisdiction by its very nature is unworkable. Concurrent zoning authority has the practical effect of nullifying the zoning authority of both sovereigns in every instance where the two establish different permissible land uses for the same tract of land. Presumably, under a scheme of concurrent jurisdiction, every proposed land use would have to satisfy the more stringent of the two competing zoning codes. Such a system obviously would defeat the efforts of both sovereigns to establish comprehensive plans for the systematic use of the lands within their respective jurisdictions.

This Court confronted a similar problem in *Mescalero Apache.* There, the State sought concurrent jurisdiction over non-Indian hunting and fishing on the reservation, even though the State's regulations were in conflict with, and sometimes more restrictive than, the Tribe's regulations. We held that state authority was pre-empted. "It is important to emphasize," the Court stated, "that concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation. Concurrent jurisdiction would empower New Mexico wholly to supplant tribal regulations." 462 U. S., at 338. The same holds true here. Concurrent jurisdiction would defeat the Tribe's abil-

ity to regulate land use on reservation fee lands and, moreover, significantly would impair its ability to zone its trust lands, which in many areas are intermingled with lands over which the State would exercise controlling authority.  Accordingly, although the State may assert zoning authority on the reservation in areas where the tribe has not exercised its zoning powers, once a tribe chooses to assert its zoning authority, that authority must be exclusive.[9]

This conclusion, though not derived from federal statutory law, finds considerable support in the Federal Government's active and "longstanding policy of encouraging tribal self-government." *Iowa Mutual Ins. Co. v. LaPlante*, 480 U. S., at 14.  Federal Indian policy "includes Congress' overriding goal of encouraging 'tribal self-sufficiency and economic development,'" *Mescalero Apache*, 462 U. S., at 335, quoting *White Mountain Apache*, 448 U. S., at 143, and we have long recognized that tribal authority over on-reservation conduct must be "construed generously in order to comport . . . with the federal policy of encouraging tribal independence." *Id.*, at 144.  I shall not rehearse the many federal statutes noted by the Court of Appeals that recognize tribal sovereignty and encourage tribal self-government.  Some of these specifically facilitate and encourage tribal management of Indian resources and promote the transfer of zoning authority from the Federal Government to the tribe.  See *Confeder-*

---

[9] It may be that on some reservations, including the Yakima Reservation, there are essentially self-contained, definable, areas in which non-Indian fee lands so predominate that the tribe has no significant interest in controlling land use.  I note that the Yakima Reservation includes three incorporated towns—Harrah, Toppenish, and Wapato—that comprise almost exclusively non-Indian fee lands.  *Confederated Tribes and Bands of the Yakima Indian Nation v. Whiteside*, 828 F. 2d, at 531.  Since the Tribe never has attempted to zone lands within the incorporated towns, this litigation does not present the difficult question whether the Tribe's interest in comprehensive zoning is sufficient to justify its exercise of zoning authority over a discrete portion of the reservation which includes no appreciable percentage of trust lands.

*ated Tribes and Bands of Yakima Indian Nation* v. *White-side,* 828 F. 2d 529, 533 (CA9 1987).

Unlike the Court of Appeals, I find no room here for a remand to consider more closely the nature of the county's conflicting interests. When it is determined that the Tribe, which is the one entity that has the power to zone trust lands, also has the power to zone fee lands, the inherent unworkability of concurrent zoning requires the conclusion that the Tribe's power to zone, once it chooses to exercise that power, is exclusive. No further balancing of interests is required. Thus, I would hold that, as to both "open" and "closed" lands, the County of Yakima is without authority to zone reservation lands, including fee lands.[10]

---

[10] I agree with JUSTICE WHITE, *ante,* at 415–416, n. 2, that subsequent events have obliterated the distinction between the so-called "open" and "closed" areas of the reservation that informed both the District Court and the Court of Appeals decisions. Absent this distinction, I see no difference between the Brendale and Wilkinson properties and, therefore, disagree with the Court of Appeals that these cases should be remanded to the District Court for consideration of the State's interest in zoning the Wilkinson property. As the Court of Appeals concluded, the Tribe has established a sufficient interest in zoning the Wilkinson property to support its inherent power to zone. Because of the unworkability of concurrent zoning, the State is pre-empted from zoning that land.